Filed: March 14, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-2162
(1:09-cv-00474-NCT-LPA)

RONEN HALPERN,

            Plaintiff - Appellant,

      v.

WAKE FOREST UNIVERSITY HEALTH SCIENCES,

            Defendant - Appellee.

--------------------

DISABILITY RIGHTS NORTH CAROLINA,

            Amicus Supporting Appellant.

O R D E R

        The Court amends its opinion filed February 28, 2012, as follows:

        On page 8, first line of text in subsection C. -- "Western District" is corrected to read "Middle District."

                              For the Court – By Direction

                              /s/ Patricia S. Connor
                                        Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RONEN HALPERN,

        *Plaintiff-Appellant,*

v.

WAKE FOREST UNIVERSITY HEALTH
SCIENCES,

        *Defendant-Appellee.*

No. 10-2162

DISABILITY RIGHTS NORTH
CAROLINA,

        *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
N. Carlton Tilley, Jr., Senior District Judge.
(1:09-cv-00474-NCT-LPA)

Argued: December 8, 2011

Decided: February 28, 2012

Before NIEMEYER, MOTZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Niemeyer and Judge Motz joined.

## COUNSEL

**ARGUED:** Lisa Grafstein, LAW OFFICE OF LISA GRAFSTEIN, PLLC, Raleigh, North Carolina, for Appellant. Jill

Stricklin Cox, KILPATRICK TOWNSEND & STOCKTON, LLP, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** John R. Rittelmeyer, Adrienne E. Allison, DISABILITY RIGHTS NORTH CAROLINA, Raleigh, North Carolina, for Amicus Supporting Appellant.

---

**OPINION**

FLOYD, Circuit Judge:

Appellant Ronen Halpern brought an action alleging that his dismissal from medical school for unprofessional behavior violated the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182. The district court granted summary judgment in favor of Appellee Wake Forest University Health Sciences (Wake Forest or the Medical School). Halpern filed this timely appeal. Because we agree with the district court that, with or without a reasonable accommodation, Halpern was not "otherwise qualified" to participate in the Medical School's program, we affirm.

I.

A.

Halpern was enrolled in Wake Forest's Doctor of Medicine program from July 2004 to March 2009. As at most medical schools, Wake Forest's curriculum is designed as a four-year program. During the first two years, students take classes to acquire knowledge in core areas, and for the last two years, students participate in rotations in different clinical environments. Prior to beginning these rotations, students must pass Step One of the United States Medical Licensure Examination (the Step One Exam).

The Medical School's Student Bulletin outlines the seven fundamental educational goals of its curriculum. One of these is that students establish "[p]rofessional [a]ttitudes and [b]ehavior." The Bulletin instructs that to satisfy this goal, students must demonstrate, prior to graduating, their respect for and ability to work with other health care professionals, adherence to the highest standards of integrity, ability to admit mistakes and lack of knowledge, and other identified aspects of professional behavior.

B.

Halpern has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and anxiety disorder—not otherwise specified,[1] both of which he treats with prescription medications. He received his ADHD diagnosis while he was an undergraduate student at Emory University, and Emory provided accommodations for this disability. Upon matriculating at Wake Forest in July 2004, Halpern failed to disclose his ADHD diagnosis, and he did not request any disability-related accommodations.

Halpern's difficulties with professionalism began almost immediately after his arrival at the Medical School and continued throughout the first two years of his enrollment. In August 2004, Academic Computing staff reported that Halpern had acted in a "very abusive" manner that was "far and beyond worse" than anything they had experienced with other students. Dr. Joseph Ernest, then-Associate Dean of Student Services, met with Halpern and convinced him to apologize

---

[1]Dr. Robert Finch testified in a deposition that he first diagnosed Halpern with an anxiety disorder in the spring of 2006, during Halpern's second year as a medical student. Halpern could not recall the precise date that he received this diagnosis but related that he believed it occurred while he was enrolled in the Medical School. Halpern informed the school of his anxiety disorder only after the Student Progress and Promotions Committee recommended his dismissal.

for his behavior so as to "set[] a more professional standard for his interactions" with Academic Computing.

During the fall of his second year of medical school, Halpern was absent from a small group session without notice. He falsely represented to faculty members inquiring into his absence that he had given advance notice to the group facilitators that he would not be present. When confronted, he retorted that he "got more out of" a different small group session that he had opted to attend without permission "than any . . . lecture, small group, or . . . class assignment to date." Subsequently, he was late to a lecture but signed the attendance sheet as though he had arrived on time. Faculty members contacted him regarding the discrepancy, and he replied that he was already "well aware of" the issues discussed. Halpern now attributes his conduct during this period to side effects of his ADHD medication.

Halpern experienced a severe reaction to this medication during the spring of his second year of school. He first informed the Medical School of a potential problem in March 2006, when he asked to postpone his Step One Exam. After Halpern presented a doctor's note explaining that he was suffering an adverse reaction to medication, the Medical School approved Halpern's request to delay the exam until May 2006. In May, Halpern asked to delay the exam further, initially because of car problems. After the school informed him that this was an insufficient reason and that the school was unable to provide him with an alternate vehicle as he had requested, he sought and received an additional medical postponement. He successfully took the Step One Exam in June 2006.

From June 2006 to August 2006, Halpern participated in an internal medicine clinical rotation. It is undisputed his performance in this rotation was deficient. His evaluation indicates he had numerous problems, including a below-average fund of medical knowledge and difficulty forming differential

diagnoses. His "largest obstacle," however, "was his frequent lapses in professionalism": He was resistant to feedback, lacked interpersonal skills, and was absent without permission for more than one week. Additionally, Halpern failed to use an electronic log system, and he resisted efforts to help correct what he insisted was a technical problem, claiming that he had "more important things to do, like see patients." Academic Computing staff ultimately concluded that he was refusing to enter the necessary data, thereby preventing staff and faculty from recording feedback on his performance. After failing this rotation, Halpern met with Dr. Ernest and revealed that he had not slept in twelve days. Shortly thereafter, Halpern went on medical leave to address the severe side effects of his medications.

Halpern returned to the Medical School in February 2007. During conversations with Dr. Ernest discussing his return to rotations, Halpern indicated that he might seek accommodations for his medication-related insomnia, but he did not reveal his ADHD diagnosis. Dr. Ernest suggested that Halpern meet with each clerkship director prior to beginning a rotation to discuss their policy regarding absences, but he noted that some of the accommodations Halpern wanted—including the ability to call out of work without prior notice if he had been unable to sleep—likely would be infeasible. Dr. Ernest explained that, like practicing physicians, medical students were expected to provide advance notice of absences whenever possible and to coordinate coverage for patient care. Halpern reports that he felt discouraged from seeking an accommodation, and he failed to submit a formal request for any accommodation. In this meeting with Dr. Ernest, Halpern signed an acknowledgement that he was on "Academic or Professional Probation" as a result of failing a rotation.

Halpern resumed clinical rotations in April 2007. From April 2007 to October 2008, he successfully completed ten clinical rotations. The evaluations for these rotations show he

received either passing or honors marks in the "Patient Rapport/Professionalism" category, and many of the comments regarding his performance were positive. But, these records also reveal several incidents of unprofessional behavior in connection with his rotations. His neurology evaluation noted he missed a required lecture with the clerkship director. He also failed to appear for a family medicine examination in October 2007 and did not respond when paged. Although Dr. Ernest recommended that the family medicine faculty give him a failing grade for this exam, they permitted him to take it at a later date. The evaluation of his obstetrics/gynecology (OB/GYN) rotation was particularly critical. The evaluator reported Halpern had difficulty with constructive criticism and recommended that he "[b]e more humble," "accept feedback graciously," and "[r]ealize that rules apply to [him] as well as everyone else."

His interaction with staff members revealed more, and more acute, problems with professionalism. In April 2007, shortly after his return from medical leave, he paced back and forth in the financial aid office for forty-five minutes stating that someone should give him a scholarship to become a trauma surgeon. The financial aid director reported this bizarre behavior made her "very nervous."

In December 2007, Halpern requested, for the first time, an accommodation for his ADHD—specifically, testing accommodations for a surgery examination. He emailed this request to Dr. Ernest. Although Dr. Ernest informed him that the school required him to meet with a faculty member prior to receiving accommodations, he repeatedly sought to receive accommodations without first attending such a meeting. Halpern neglected to produce documentation of his disability until the day of the exam; nevertheless, the Medical School provided the requested accommodations.

Halpern failed to respond in October 2008 to repeated requests from student services staff that he review the "Dean's

Letter" to be mailed out with his residency applications. Several hours after the deadline to respond had passed, he appeared at the student services office, "rude[ly]" insisting that the letter contained numerous errors and expressing disbelief that the staff member responsible for the letter was not there.

Finally, in November 2008, Halpern failed to send letters of appreciation to scholarship donors, despite numerous reminders. Although typically this would not have resulted in expulsion, because Halpern was on probation due to his failure of the internal medicine rotation, the Medical School referred his file to the Student Progress and Promotions Committee (SPPC), which makes disciplinary recommendations to the Medical School's dean. A student may appeal the SPPC's recommendation to the Academic Appeals Committee, but the dean of the Medical School makes the ultimate determination regarding discipline.

Halpern appeared before the SPPC in December 2008. During this appearance, he maintained that his medical condition did not affect his ability to "perform optimally in the medical curriculum." He further asserted his belief that the incidents of unprofessionalism "were isolated" and that he had "addressed them." After reviewing his records, the SPPC voted to recommend Halpern's dismissal based on a pattern of unprofessional behavior.

Halpern appealed to the Academic Appeals Committee through a letter to Associate Dean of Education, Dr. K. Patrick Ober. Halpern wrote that he was aware of his "behavioral tendencies"—including excessive defensiveness, intolerance of others, and rudeness—which he attributed both to his ADHD and to cultural differences between Israel, where he grew up, and the United States. Halpern suggested a "special remediation" plan including a comprehensive assessment by a treatment team, participation in a program for distressed physicians, continuing treatment by his psychiatrist, and

"strict probation." He also submitted letters from his psychiatrist, Dr. Doreen Hughes, who ascribed his behavior to ADHD, an anxiety disorder, and childhood exposure to trauma, family modeling, and first-hand accounts of the Holocaust. After reviewing these materials and Halpern's record, the Academic Appeals Committee upheld the SPPC's recommendation.

Halpern then appealed to the Dean of the Medical School, Dr. William Applegate. Dr. Applegate considered and rejected alternatives to dismissal, including Halpern's suggested plan. Dr. Applegate explained that he believed, in light of the pattern of behavior Halpern engaged in both before and after his medical leave, Halpern inevitably would revert to unprofessional conduct. Particularly concerning was Halpern's treatment of staff members. While Halpern might be able to control his behavior towards other physicians, Dr. Applegate worried that the incidents with Medical School staff indicated he would treat nonphysician health care providers in a disrespectful and unprofessional manner. Such an attitude would undermine the team-centered approach to health care that Wake Forest sought to instill and would have a deleterious effect on patient care. Concluding that no accommodation could adequately alleviate these concerns, Dr. Applegate adopted the SPPC's recommendation of dismissal.

C.

Halpern brought suit in the Middle District of North Carolina, alleging that his dismissal violated the Rehabilitation Act and ADA because the Medical School failed to make reasonable accommodations for his disability. The district court, adopting the magistrate judge's report and recommendation, granted summary judgment in favor of Wake Forest on the ground that Halpern was not "otherwise qualified" as a medical student because demonstrating professionalism was a fundamental aspect of the Medical School's program. The court further held that Halpern's proposed accommoda-

tion—obtaining therapeutic treatment, participating in a distressed physicians program, and continuing as a student on strict probation—was unreasonable "because of the uncertainty of the duration and the prospects for success of such behavior modification efforts."

## II.

We review de novo an order granting summary judgment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). We will affirm the grant of summary judgment if, viewing the evidence and drawing all reasonable inferences therefrom in favor of the nonmovant, there are no disputed material facts and the moving party is entitled to judgment as a matter of law. *Id.*

## A.

Wake Forest, as a "program . . . receiving Federal financial assistance," is subject to the Rehabilitation Act of 1973. 29 U.S.C. § 794(a). In addition, because it is an "undergraduate, or postgraduate private school, or other place of education," 42 U.S.C. § 12181(7)(J), Wake Forest qualifies as a "public accommodation" subject to Title III of the ADA.[2] *See, e.g.*,

---

[2]In his complaint, Halpern alleged that Wake Forest violated Title II, which regulates public entities, rather than Title III, of the ADA. He contends, however, that his claim was merely mislabeled and that it was clear he was seeking to bring a Title III claim. Because the correction of the legal basis for the claim would not prejudice Wake Forest, he argues, we should treat this claim as arising under Title III. *See Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995) (holding that the mislabeling of a claim, even if "reflect[ing] a flat misapprehension by counsel respecting a claim's legal basis," does not warrant dismissal "so long as any needed correction of legal theory will not prejudice the opposing party"). We need not decide at this time whether to construe Halpern's complaint as stating a Title III claim. As we explain, the "otherwise qualified" element is identical for claims brought under the Rehabilitation Act and the ADA, and Wake Forest would be entitled to summary judgment on any Title III

*Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097 (D.C. Cir. 2007) (applying Title III to a private medical school); *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432 (6th Cir. 1998) (applying Title III to a private podiatric college).

The Rehabilitation Act precludes federal grantees from excluding, denying benefits to, or discriminating against any "otherwise qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). Title III of the ADA provides, in relevant part, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). This section goes on to define "discrimination" as including "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with such full and equal enjoyment, "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." *Id.* § 12182(b)(2)(A)(ii).

To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir. 1995). Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability. *See Bowers v. NCAA*, 475 F.3d 524, 535 n.12 (3d Cir. 2007) (examining

claim because the evidence in the record establishes that Halpern, with or without reasonable accommodations, was not otherwise qualified to participate in the Medical School's Doctor of Medicine program. Accordingly, we assume without deciding that Halpern has properly asserted a claim under Title III of the ADA.

claims under the Rehabilitation Act and Titles II and III of the ADA). In the context of a student excluded from an educational program, to prove a violation of either Act, the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the defendant's program,[3] and (3) he was excluded from the program on the basis of his disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (applying the Rehabilitation Act and Title II of the ADA); *see also Kaltenberger*, 162 F.3d at 435 (applying the Rehabilitation Act and Title III of the ADA). The two statutes differ only with respect to the third element, causation. To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded "solely by reason of" his disability; the ADA requires only that the disability was "a motivating cause" of the exclusion. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–69 (4th Cir. 1999).

---

[3]Title III, unlike Title II, of the ADA does not explicitly include the "qualified individual" language used in the Rehabilitation Act. *See* 42 U.S.C. § 12182(a). Nevertheless, Title III implicitly incorporates the requirement that a claimant be "otherwise qualified" because "the question of who is 'otherwise qualified' and what actions constitute 'discrimination'" are "two sides of a single coin; the ultimate question is the extent to which a [defendant] is required to make reasonable modifications in its programs." *Alexander v. Choate*, 469 U.S. 287, 299 n.19 (1985); *see also Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006) (observing that "in most circumstances, no qualifications are required to enjoy a public accommodation," but in the education context, "the 'otherwise qualified' idea is implicit in Title III's acknowledgment . . . that requested modifications need not be provided if they will fundamentally alter the nature of the program"); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 154 (1st Cir. 1998) (finding "little difference" between ADA Titles I, II, and III "because many of the issues that arise in the 'qualified' analysis, also arise in the context of the 'reasonable modifications'"). In other words, if a person, due to his disability, requires a modification to meet the essential requirements to participate in an educational program and if the necessary modification is unreasonable, then that person is not "qualified" to participate in the program. *See Bercovitch*, 133 F.3d at 154.

Wake Forest concedes that Halpern has satisfied the first element. His ADHD and anxiety disorder constitute disabilities giving rise to protection under the Rehabilitation Act and ADA.[4] Accordingly, we consider whether the district court erred in determining as a matter of law that Halpern was not "otherwise qualified" to participate in the Medical School's program.

B.

A "qualified" individual is one "who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements" for participation in a program or activity. *Constantine*, 411 F.3d at 498 (quoting 42 U.S.C. § 12131(2)) (internal quotation marks omitted); *see also Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."). A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified. *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994). To determine whether a plaintiff has satisfied this burden, a court must decide whether he has presented sufficient evidence to show (1) that he could satisfy the essential eligibility requirements of the program, i.e., those requirements "'that

---

[4]Wake Forest suggests that the side effects of medications Halpern took to treat these conditions should not be considered aspects of his disability and, as a result, do not give rise to protection under federal law. The cases cited by Wake Forest in support of this argument, however, are inapposite because they address treatment and medication for nondisabling conditions, so those courts were determining whether the side effects of medical treatment could give rise to a disability that was not otherwise present. *See, e.g.*, *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 186–87 (3d Cir. 2010); *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). It is unnecessary to reach this issue because Halpern has failed to establish that he is otherwise qualified to participate in the Medical School's program. Thus, for purposes of this appeal, we assume arguendo that the side effects Halpern suffered, including insomnia and irritability, fall within his disability.

bear more than a marginal relationship to the [program] at issue,' and (2) if not, whether 'any reasonable accommodation by the [defendant] would enable'" the plaintiff to meet these requirements.[5] *Id.* (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)).

The parties dispute whether we should accord deference to the Medical School's professional judgment regarding Halpern's ability to satisfy the School's essential eligibility requirements. In the context of due-process challenges, the Supreme Court has held that a court should defer to a school's professional judgment regarding a student's academic or professional qualifications. *See Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (stating that a court may not override a school's decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment"); *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92 (1978) ("Courts are particularly ill-equipped to evaluate academic performance.").

Based on these cases, our sister circuits have overwhelmingly extended some level of deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims. *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004); *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1028 (8th Cir. 1999); *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1047–48 (9th Cir. 1999); *Kaltenberger*, 162 F.3d at 436; *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 859 (5th Cir. 1993); *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25

---

[5]"The standard for reasonableness under the ADA does not differ from the one employed under the Rehabilitation Act," even though "Title III of the ADA uses the term 'reasonable modification' rather than 'reasonable accommodation,'" the term utilized in Rehabilitation Act doctrine. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004) (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999)) (internal quotation marks omitted).

(1st Cir. 1991) (en banc); *Anderson v. Univ. of Wis.*, 841 F.2d 737, 741 (7th Cir. 1988); *see also Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 367 (3d Cir. 2008). And we have observed in dicta that, in general, "great deference to a school's determination of the qualifications of a hopeful student" is appropriate "because courts are particularly ill-equipped to evaluate academic performance." *Davis v. Univ. of N.C.*, 263 F.3d 95, 101–02 (4th Cir. 2001) (dictum) (quoting *Horowitz*, 435 U.S. at 92) (internal quotation marks omitted).

Because we are likewise at a comparative disadvantage in determining whether Halpern is qualified to continue in the Doctor of Medicine program and whether his proposed accommodations would effect substantial modifications to the Medical School's program, we accord great respect to Wake Forest's professional judgments on these issues. But, in doing so, we must take care "not to allow academic decisions to disguise truly discriminatory requirements," *Zukle*, 166 F.3d at 1048, so we assiduously review the record to ensure that the educational institution has "conscientiously carried out [its] statutory obligation" to provide reasonable accommodations to persons with disabilities, *id.* (quoting *Wynne*, 932 F.2d 25–26) (internal quotation marks omitted).

Adopting an appropriately deferential view, we find that professionalism was an essential requirement of the Medical School's program and that, without an accommodation, Halpern could not satisfy this requirement. Throughout the period of Halpern's enrollment at Wake Forest, the Medical School identified professionalism as a fundamental goal of its educational program, and it required that students demonstrate professional behavior and attitudes prior to graduating. The Student Bulletin explicated different aspects of professional behavior that the school sought to instill, such as the ability to collaborate with others and to admit mistakes gracefully. As Dr. Applegate explained in his affidavit, the Medical School emphasized professionalism based on evidence that

inappropriate and disruptive behavior by physicians increases adverse patient outcomes.

Halpern does not dispute that the Medical School's professionalism requirement is essential. Instead, he maintains that because he received passing marks in professionalism in his clinical rotations after returning from medical leave, a question of fact exists as to whether he satisfied the requirement. This argument, however, fails to take into account Halpern's treatment of staff both before and after his medical leave. We accept Dr. Applegate's reasonable inference that Halpern's unprofessional treatment of staff, in contrast with his behavior towards faculty, suggests that he would interact poorly with health care providers who are not physicians, thereby undermining the team approach to health care. Halpern's contention also ignores the instances of unprofessional conduct reflected in his clinical evaluations, such as his resistance to constructive criticism during his OB/GYN rotation and failure to appear for a family medicine exam. Although, in isolation, these may not have warranted his evaluators giving him failing grades in professionalism, the school reasonably considered them as part of an ongoing pattern of unprofessional behavior.

Halpern's own admissions support the conclusion that without an accommodation he is unqualified to participate in the Doctor of Medicine program. In his letters appealing the SPPC's recommendation of dismissal, Halpern acknowledged his problematic behavioral tendencies. He did not argue that the professionalism requirement was nonessential or that he should be exempted. Instead, he requested the opportunity to undergo treatment and demonstrate he could satisfy the School's professionalism standards. Similarly, when deposed, he conceded that his past behavior had been perceived as rude, and he stated that the Medical School should not permit him to become a doctor if he was rude or hostile.

In light of the extensive evidence of Halpern's unprofessional behavior—both before and after his medical

leave—and the potential for such behavior to undermine patient care, we have no difficulty concluding that, absent an accommodation, Halpern was not "otherwise qualified" for the Medical School's program. Therefore, we next consider whether there was a reasonable accommodation available by which Halpern would have become qualified.

## C.

Federal law mandates that federal grantees and public accommodations make "reasonable," but not "substantial" or "fundamental," modifications to accommodate persons with disabilities. *See Alexander*, 469 U.S. at 300. A modification "is not reasonable if it either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program." *Sch. Bd. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (citation omitted) (quoting *Davis*, 442 U.S. at 410, 412) (internal quotation marks omitted); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001) (requiring that a modification be reasonable, be necessary, and not fundamentally alter the nature of the program). A modification to "an essential aspect" of the program constitutes a "fundamental alteration" and, therefore, is an unreasonable accommodation. *PGA Tour*, 532 U.S. at 682–83. Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is "reasonable on its face, *i.e.*, ordinarily or in the run of cases," or if the defendant establishes as a matter of law that the proposed modification will cause "undue hardship in the particular circumstances." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002).

As discussed above, we find that the requirement that students demonstrate professional behavior is an essential aspect of Wake Forest's Doctor of Medicine program. Accordingly, Halpern could not reasonably seek to avoid or lessen the pro-

fessionalism requirement; rather, he must show that a reasonable accommodation would have permitted him to satisfy this criterion. He contends that his proposed special remediation plan, which included ongoing psychiatric treatment, participation in a program for distressed physicians, and continuing in the Medical School on strict probation, constituted a reasonable accommodation for his disability through which he could have met Wake Forest's standards for professionalism. We disagree. For the following reasons, we conclude that Halpern's proposed special remediation plan was unreasonable on its face and, as a result, that the district court properly granted summary judgment in favor of Wake Forest.

First, Halpern's request for an accommodation was untimely. The school was not obligated to accommodate Halpern's disability until he "provided a proper diagnosis . . . and requested specific accommodation." *Kaltenberger*, 162 F.3d at 437. Halpern failed to inform Wake Forest that he was disabled until December 2007, and when he did so, he requested only testing accommodations. Even when he appeared before the SPPC, he maintained that his medical conditions did not impact his ability to participate in the Medical Schoool. He suggested, for the first time, that his behavioral problems were manifestations of a disability in his letter to Dr. Ober appealing the SPPC's recommendation of dismissal.

We have previously observed that "misconduct—even misconduct related to a disability—is not itself a disability" and may be a basis for dismissal. *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n.3 (4th Cir. 1997); *see also Tyndall*, 31 F.3d at 214–15 (finding the dismissal of an employee for attendance problems did not constitute discrimination, even if her disability caused her absences); *Little v. FBI*, 1 F.3d 255, 259 (4th Cir. 1993) (holding that employee could be terminated for intoxication, although it was related to alcoholism, a disability). By the time Halpern requested that the Medical School implement his special remediation plan, he had already engaged in numerous unprofessional acts that war-

ranted his dismissal, including acting abusively towards staff, multiple unexcused absences, repeated failure to meet deadlines, and tardiness. Thus, Halpern sought not a disability accommodation, but "a second chance to better control [his] treatable medical condition." *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). This, however, "is not a cause of action under the ADA." *Id.* A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability. Halpern's argument that he was owed an opportunity to continue at the Medical School and correct his misbehavior is, therefore, without merit.

Second, the indefinite duration and uncertain likelihood of success of Halpern's proposed accommodation renders it unreasonable. In *Myers v. Hose*, 50 F.3d 278 (4th Cir. 1995), we held that the Rehabilitation Act and ADA do not require an employer to give a disabled employee "an indefinite period of time to correct [a] disabling condition" that renders him unqualified. *Id.* at 280. The plaintiff in *Myers* had worked as a bus driver until health problems prevented him from passing mandatory physical examinations. *See id.* at 280–81. After his forced retirement, he filed suit, arguing that federal disability laws compelled his employer to provide a grace period to treat his medical conditions. *Id.* at 282. We rejected this accommodation as unreasonable because it required the employer "to wait indefinitely" for an uncertain cure. *Id.* at 283. A "reasonable accommodation," we declared, "is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Id.*

Likewise, the Rehabilitation Act and ADA do not obligate a school to permit a student to continue in an educational program with the hope that at some unknown time in the future

he will be able to satisfy the program's essential requirements. At the time Halpern proposed the special remediation plan, he had already delayed his graduation by one year due to his medical leave, and he was seeking to further extend his medical education to have an opportunity to demonstrate his ability to behave professionally. Neither Halpern nor his expert could specify a time at which his treatment would be complete; indeed, they acknowledged there was no guarantee Halpern's treatment plan would be successful. Consequently, it was unreasonable to demand that Wake Forest wait to determine if and when the plan would enable Halpern to meet its professionalism standards.

Finally, we reject Halpern's argument that even if his proposed accommodation was unreasonable, Wake Forest violated the ADA by failing to engage in an "interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (per curiam). An interactive effort to identify an accommodation would not have corrected the untimeliness of Halpern's request or erased his record of prior misconduct. Dr. Applegate's affidavit indicates that he carefully considered alternatives to dismissal, but, because Halpern had consistently reverted to unprofessional conduct even after the Medical School's officials attempted to intervene, he was unable to identify any accommodation that could ensure Halpern would not engage in such behavior as a practicing physician. Thus, he concluded that all possible accommodations permitting Halpern to remain in the program would be unreasonable because they would allow Halpern to graduate with a medical degree.

We disagree with Halpern's contention that this conclusion reflects stereotypes that persons who experience depression or anxiety disorders are unable to change or modify their behavior. We believe, instead, that Dr. Applegate's decision was based on a careful consideration of Halpern's student record and, in particular, the fact that, despite numerous attempts by

Medical School faculty to assist Halpern in rectifying his conduct, he continually lapsed into problematic practices. Although Halpern failed to disclose his ADHD diagnosis until December 2007 and did not request accommodations for behavioral manifestations of his disability until after the SPPC recommended his dismissal, the Medical School made significant efforts throughout the period of Halpern's enrollment to help him satisfy its academic and professional standards. The record shows that Dr. Ernest, in his role as Associate Dean of Student Services, often interceded when Halpern had an altercation or incident with faculty or staff and attempted to counsel Halpern on appropriate behavior. In addition, the School granted Halpern the medical leave and testing accommodations that he requested. Despite these efforts, Halpern's lack of professionalism remained an issue. Where a professional school has reasonably determined based on an identifiable pattern of prior conduct that a student is unfit to join his chosen profession, federal law does not obligate the school to allow that student to remain in and graduate from its educational program. As the evidence in the record amply justifies Dr. Applegate's conclusion, we find that the Medical School did not violate the Rehabilitation Act or the ADA.

### III.

Because, with or without reasonable accommodations, Halpern is unqualified for Wake Forest's Doctor of Medicine program, we affirm the district court's grant of summary judgment.

*AFFIRMED*