**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-2425**

CLAUDINE NIGRO,

            Plaintiff - Appellant,

        v.

VIRGINIA COMMONWEALTH UNIVERSITY/MEDICAL COLLEGE OF
VIRGINIA; FRANCIS X. DENNEHY, M.D.; WARREN MEMORIAL
HOSPITAL; VALLEY HEALTH SYSTEM,

            Defendants – Appellees,

        and

APPALACHIAN OSTEOPATHIC POSTGRADUATE TRAINING INSTITUTE
CONSORTIUM,

            Defendant.

Appeal from the United States District Court for the Western
District of Virginia, at Harrisonburg.  Glen E. Conrad, Chief
District Judge. (5:09-cv-00064-gec-bwc)

Argued:  May 16, 2012                Decided:  June 21, 2012

Before TRAXLER, Chief Judge, and KING and DUNCAN, Circuit
Judges.

Affirmed by unpublished opinion.  Judge Duncan wrote the
opinion, in which Chief Judge Traxler and Judge King joined.

**ARGUED:** Nicholas Hantzes, HANTZES & REITER, McLean, Virginia, for Appellant. Cathleen Patricia Welsh, LENHART & OBENSHAIN, PC, Harrisonburg, Virginia, for Appellees. **ON BRIEF:** Mark D. Obenshain, Andrew S. Baugher, LENHART & OBENSHAIN, PC, Harrisonburg, Virginia, for Appellees Warren Memorial Hospital, Valley Health System, and Francis X. Dennehy, M.D.; Sydney E. Rab, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, Susan T. Ferguson, VCU GENERAL COUNSEL'S OFFICE, Richmond, Virginia, for Appellee Virginia Commonwealth University/Medical College of Virginia.

_____

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Claudine Nigro, a former medical resident in the Shenandoah Valley Family Residency Program (the "Program"), brought a myriad of state and federal law claims against the Program, Valley Health System ("VHS"), VCU/Medical College of Virginia ("VCU"), Warren Memorial Hospital (the "Hospital"), and Dr. Francis X. Dennehy (collectively, the "Defendants"), after she was not permitted to advance to the second year of the Program. The district court granted the Defendants' motion to dismiss on most of her claims and, shortly thereafter, granted summary judgment on the rest. For the reasons below, we affirm.

I.

The facts are lengthy and somewhat involved. For the sake of clarity, we divide them into three parts. We first describe the Program. We next discuss Nigro's tenure in the Program. Finally, we detail the proceedings leading to this appeal.

A.

We turn first to the Program, which consists of three years: R-1, R-2, and R-3. Residents contract with the Program for each year. For example, Nigro's contract (the "Contract") covered her R-1 year, which was to run from July 1, 2008 to June 30, 2009. The residents' contracts stipulate salary, certain professional responsibilities, and the terms under which they

3

may be renewed or terminated. The American Council for Graduate Medical Education ("ACGME") also plays a role. ACGME has guidelines applicable to many aspects of the contracts that the Program signs with its residents. In addition to their contracts, residents receive separate documents containing additional procedures (the "Procedures"), which detail the finer points about how the residency operates. ACGME guidelines influence the Procedures as well. However, unlike their contracts, neither the residents nor representatives from the Program sign the Procedures.

Residents in the Program rotate through several practices in their R-1 year and therefore work with different faculty members during that period. They work primarily at the Hospital, which is owned by VHS. Throughout their rotations, both "Core" and "Specialty" Faculty members supervise the residents and provide them with ongoing instruction, mentoring, and evaluations. The Core Faculty, in addition to teaching in rotations, assists the Program Director, Dr. Francis Dennehy, in running the Program. The Core Faculty meets regularly to discuss the performance of individual residents and votes to take action against underperforming residents. The Specialty Faculty focuses on instructing residents in their rotations. Each resident has a faculty advisor who reviews the resident's

progress and proffers advice on any areas of concern. All of the Program's faculty members are professors at VCU.

Faculty members assess the residents at several points during the year. At the end of each rotation, the doctors supervising that rotation fill out a standard form evaluating the resident on several substantive criteria and various aspects of professionalism. These forms instruct the faculty that 80 percent of the residents should be marked "average." The residents' contracts and the Procedures describe how the Program typically deals with residents who perform below average. The relevant provisions of Nigro's contract follow.

First, § 3.7, the only provision to speak of non-renewal, provides that:

> When deciding not to renew Resident's agreement, the Residency Program agrees to provide Resident with as much advance written notice of its decisions as may be reasonably permitted under the circumstances. To the extent possible, the Residency Program will try to provide four months' advance written notice before the end of the then-current term. However, the Residency Program will not be bound by the foregoing and it reserves the right to provide Resident with less than four months['] written notice.

J.A. 66. Next, § 5 contemplates performance review policies. Relevant to this appeal, it provides that:

> The Residency has a procedure whereby any resident terminated by the Residency for deficiencies in Clinical Competence, Technical Skill, and/or Professional Behavior is granted due process.

5

Residents will be notified at least four months in advance through the winter semi-annual review process if promotion or reappointment is in jeopardy, unless behavior preventing reappointment occurs during the four months prior to the start of each academic year.

J.A. 68. Finally, § 14 is an integration clause stating that:

This agreement contains the final and entire agreement between the parties, and they shall not be bound by any terms, conditions, statements or representations, oral or written, not herein contained or contained in a written amendment to this Agreement executed by the parties hereto. This Agreement may be amended only by written agreement executed by the parties.

The Procedures provide for a slightly different course for dealing with underperforming residents. They specify that an underperforming resident should first be placed on probation and given four months to improve before any dismissal action is taken. They further provide for a process by which a resident may appeal any disciplinary action to a subcommittee of the faculty.

## B.

Nigro signed the Contract with the Program in March of 2008. Nigro claims that she passed all of her rotations and that she did a satisfactory job in each of them. While it is correct that she technically passed every rotation, the record contradicts her claim that her performance was consistently satisfactory. For example, Dr. Sherry Whisenant, who was assigned as her advisor, testified that Nigro had performed

6

poorly in medical school and that she received a very low score on an exam administered during orientation.

Nigro's reviews from her rotations indicate that her performance grew worse as the year went on. Most of the reviews from her first rotations in the summer of 2008 describe her work as average; Dr. Dennehy's review was not entirely positive. Moving into the fall, Nigro received mixed reviews in her pediatrics and family practice rotations, receiving several poor marks on substantive criteria, but garnering positive reviews in "Professional Characteristics," which includes nonsubstantive criteria such as appropriate dress. The reviews from her ER and internal medicine rotations were less consistent--some doctors rated her "knowledge base" above average and others found her to be lagging behind her peers. Cumulative reviews of her performance in the fall of 2008 also describe her substantive skills as being significantly below her peers.

Some of Nigro's faculty supervisors became very concerned by her performance during Nigro's rotation in the neonatal intensive care unit ("NICU") in December 2008. Dr. Lee, a Specialty Faculty member overseeing that rotation, informed Dr. Dennehy that Nigro was in danger of failing and did not seem concerned about patient care. According to Dr. Dennehy, Dr. Lee also reported that she was arriving before her shift, when there

7

was little to do, and using that as an excuse to leave early.[1]

In the final comments section of his review, Lee said:

> This one is very hard.  In reality, she likely would have failed in a different year.  But there is great concern of Claudine returning to the NICU rotation for the sake of the staff . . . . Claudine passed more because her deficiencies cannot be corrected with another rotation in the NICU . . . .  She met the barest minimum to this rotation but I do not believe she will be able to survive internship and/or residency without a change in her inner drive . . . . I did not have the heart to tell her about my belief that she may not make it through internship/residency.

J.A. 605.  Dr. Clawson, who also supervised Nigro during her NICU rotation, echoed Dr. Lee's assessment in his review.

In January 2009, after her NICU rotation, Nigro took a survey from the ACGME that asked whether she had ever worked seven consecutive days without one day off.  ACGME limits the number of hours that residents are allowed to work in any given week and requires residency programs to adhere to this limit as a condition of their accreditation.  Nigro reported that the Program had once required her to work 12 consecutive days, which is more than ACGME allows.  When she asked Dennehy about this evaluation, Nigro claims that he told her to respond "on average," which she interpreted as a request to answer

---

[1] Nigro says that Dr. Dennehy's allegation that she left early is untrue and claims that Dr. Dennehy defamed her when he repeated Dr. Lee's alleged critique to others.

untruthfully. She alleges that her truthful answer on this survey influenced the faculty's evaluations of her work.

By February 2009, there was growing concern among the Faculty that Nigro had made the wrong career choice and that she was exhibiting signs of depression. At her semiannual performance review on February 4, 2009, she received an "Individual Improvement Plan" (the "IIP"), which required her to seek counseling and to show greater empathy. Although Nigro signed the IIP, someone wrote "not planning to do discuss with pastor" next to the requirement that she seek counseling. J.A. 571. Apparently, Nigro initially refused to comply with the counseling requirement because she believed it to conflict with her Christian faith. She thus became the first resident in the history of the Program to refuse to comply with an IIP. Nigro states that she believed that Dr. Dennehy had no objection to her use of her pastor as a counselor.

Nigro further claims that when she saw the letter memorializing her semiannual performance review, the last sentence stated, "it is expected that barring unforeseen circumstances, she is likely to be promoted to R-2 at the end of June." J.A. 594. She claims that, unbeknownst to her, Dr. Dennehy added language addressing some of the more serious concerns from her NICU evaluations. He also noted that her explanation for her shortcomings was that others did not like

9

her. The added language further said "[o]ur greatest concern is the denial that there is anything wrong, when evaluations come from so many levels and so many angles." J.A. 595.

Dr. Dennehy, Dr. Whisenant, and the Chief Resident met with Nigro on February 25, 2009, to discuss her lack of improvement and the possibility that her Contract might not be renewed. At this meeting Nigro received a Letter of Concern, which also explained that further failure to improve and fully comply with her IIP would lead to the non-renewal.

In response to the Letter of Concern, Nigro met with Dr. Dana Medcalf for psychological evaluation on March 10, 2009. Dr. Medcalf concluded that Nigro was not depressed. He believed that the "best explanation" was that Nigro "has had problems coping with the rigors of the program." J.A. 1948. Dr. Medcalf then suggested that Nigro needed further therapy to resolve her difficulties.

Nigro received a "Notice of Non-Renewal of Contract" on March 25, 2009, which explained that she had shown no improvement in the areas identified in the February 25, 2009, Letter of Concern. This letter proposed that Nigro would receive credit for the rotations that she successfully completed, avoid probation or any other disciplinary notation on her record, and receive help in finding placement with another residency program. In April, Nigro appealed her non-renewal to

10

a subcommittee of attending physicians. In response to Nigro's appeal, Dr. Dennehy emailed the chair of the subcommittee about his concerns. Nigro claims that he defamed her to the subcommittee. A majority of the subcommittee voted to reverse the decision of the Core Faculty.

The subcommittee did not itself devise an alternative plan for Nigro. Instead, Dr. Dennehy, as director of the Program, drafted one--recorded in a memorandum dated April 20, 2009--under which she would not receive credit for the 2008-09 academic year, would be placed on probation, and would repeat her R-1 year. Nigro believed that the subcommittee violated its procedures by allowing Dennehy to draft the alternative plan. Her counsel wrote the subcommittee asking it to reconsider Dennehy's proposal. The record does not reflect whether it did so.

During communications surrounding her non-renewal Nigro allegedly told one employee that she had recorded conversations with physicians. On April 3, 2009, another employee emailed Dennehy to have him tell Nigro that taping could lead to termination. Dennehy forwarded the warning to Nigro on April 7, 2009. Nigro, however, denied making any such recording. She now considers the suggestion that she made any recordings to be defamatory.

11

Nigro's performance in the remaining months of her R-1 year continued to cause concern. For example, on June 20, 2009, another doctor who supervised Nigro communicated to Dennehy that Nigro was not ready to progress to the second year. Her end-of-year reviews are consistent with these sentiments.

Nigro resigned from the Program on June 24, 2009.

C.

Nigro filed a complaint with the EEOC on June 25, 2009. She received a right to sue letter on November 30, 2009, and filed her first complaint in the United States District Court for the Western District of Virginia on August 3, 2010. Her Second Amended Complaint, filed on December 18, 2010 included several claims against VHS, VCU, the Hospital, and Dr. Dennehy: Breach of Contract against VHS and VCU; Denial of Due Process in violation of 42 U.S.C. § 1983 against VHS, VCU and the Hospital; Defamation against Dr. Dennehy, VHS, VCU and the Hospital; Intentional Infliction of Emotional Distress against Dr. Dennehy, VHS, and VCU; Intentional Interference with Contract against Dr. Dennehy; Gender Discrimination in violation of Title VII against VCU and the Hospital; and Retaliation in violation of Title VII against VCU and the Hospital.

The Defendants filed a motion to dismiss under Federal Rule Civil Procedure 12(b)(6) on January 20, 2011. The district court dismissed Nigro's claims for Breach of Contract, Denial of

12

Due Process, Intentional Infliction of Emotional Distress, Intentional Interference with Contract, and parts of her Defamation Claim. It denied the motion to dismiss on her Title VII claims and parts of her Defamation claims.[2]

The Defendants then filed a motion for summary judgment on the remaining claims on September 30, 2011, which the district court granted.

II.

Our review of the district court's ruling on a motion to dismiss is de novo, accepting all well-pled facts as true and construing those facts in the light most favorable to the plaintiffs. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009). However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." Id. at 255. "We also decline to consider unwarranted inferences, unreasonable conclusions, or arguments." Id. (quotation marks omitted).

---

[2] Specifically, the district court found that VCU was entitled to the dismissal of all of Nigro's state-law and § 1983 claims on the basis of Eleventh Amendment immunity. On appeal, Nigro has not argued that the district court erred in concluding that VCU was immune on these claims. Accordingly, her only claim against VCU remaining in this appeal is for violating Title VII.

13

We "review[] a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court" and viewing "all facts and reasonable inferences . . . in the light most favorable to the non-moving party." Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2008) (quotation marks omitted). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If, after reviewing the record as a whole, however, we find that a reasonable jury could return a verdict for [the non-moving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

III.

We consider Nigro's claims in logical order, dealing first with those that answer predicate questions for her other claims. Accordingly, we first consider her claim for breach of contract. Second, we discuss her claim for defamation. We next turn to her claim for intentional interference with contract, followed by her claim for intentional infliction of emotional distress. Then we consider her constitutional claims. Finally, we consider her Title VII claims.

14

A.

Nigro's breach of contract claim rests on an alleged breach of the Procedures, not of the Contract itself. As discussed above, the Procedures are separate, unsigned documents. Specifically, she argues that, under the Procedures, she was entitled to four months' notice before non-renewal and that she should have first been placed on probation and given a chance to improve. The district court held that the integration clause barred it from considering the Procedures as part of the contract. On appeal, Nigro claims both that the integration clause does not bar the consideration of the Procedures and that even if it does, Virginia law independently prohibits employers from violating any procedures distributed to their employees. We find neither argument persuasive.

1.

With respect to Nigro's first argument, we agree with the district court that the integration clause precludes the incorporation of the Procedures into the contract. The integration clause clearly states that the contract is the entire agreement between the parties. Moreover, the only provision of the contract that arguably references the Procedures is § 3.2, which refers to "duties and responsibilities of resident." J.A. 65. Accordingly, we do not find that the Procedures bound the Program to any particular

15

course of action when dealing with Nigro's inadequacies as a doctor.

Moreover § 3.7, which deals specifically with non-renewal, provides that the Program will try to give the resident four months' notice. It goes on to say, however, that the Program "reserves the right to provide Resident with less than four months['] written notice." J.A. 66. Incorporating the Procedures into the contract and applying them to non-renewal would contradict the plain language of § 3.7. That is, even if other provisions of the contract incorporate some of the Procedures, we cannot read the Procedures' requirements as governing non-renewal because doing so would contravene the express provisions of § 3.7. We therefore find no breach of contract.

2.

Turning to her second argument--that Virginia law makes the Procedures binding on the Program notwithstanding the Contract's integration clause--we also find it unpersuasive. Here, Nigro relies on the Virginia Supreme Court's decision in Hercules Powder Co. v. Brookfield, 53 S.E.2d 804 (Va. 1949), which holds that a termination and severance policy distributed to existing employees is a binding, unilateral contract offered to secure continued service from those employees. Id. at 808; see also, Dulany Foods, Inc. v. Ayers, 260 S.E.2d 196, 199-202 (Va. 1979)

16

(relying on Hercules, and holding that memoranda circulated to improve employee morale are binding offers accepted by employees' continued service). In Hercules and Dulany, the employees received the policies in question after they began working. The new procedures in those cases changed the employees' terms of employment and effectively constituted new contracts which the employees accepted by continuing to work. Here, Nigro received the Procedures with her original Contract. As such, the Procedures were not a superseding offer that Nigro could accept through continued employment. We therefore conclude that Virginia law does not create an independent basis for Nigro's breach of contract claim.

B.

Nigro claims that ten statements made by Dennehy and two statements made by other Program employees are defamatory. We agree with the district court's grant of the Defendants' motion to dismiss with respect to the former and its grant of the Defendants' motion for summary judgment with respect to the latter because none of the allegedly defamatory statements qualify as such under Virginia law.

"In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent." Jordan v. Kollman, 612 S.E.2d 203, 206 (Va. 2005). "To be actionable, the statement must be both false and defamatory."

17

Id.  In interpreting Virginia law, we have explained that statements are defamatory if they "tend so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . . . [D]efamatory words are those that make the plaintiff appear odious, infamous, or ridiculous."  Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993) (quotation marks and citations omitted).  We will discuss Virginia law with respect to Dennehy's allegedly defamatory statements first, and then turn the other employees' statements.

1.

Nigro claims that Dennehy defamed her when he made the following statements in various meetings and notices:

1. "[Nigro] has not shown any improvement at the Front Royal Family Practice Clinic, since receiving the letter of non-renewal of contract."

2. "[Nigro] failed NICU."

3. "[Nigro] on a regular basis would leave the Clinic to go home early."

4. "There has been no evidence of improvement or intention to improve in weak areas."

5. "There is no change in apathetic/disinterested approach or demonstrated interest in learning despite 3-4 months of discussion and coaching."

18

6. "Plaintiff has poor time management with respect to internal medicine rotation."

7. "Plaintiff is making the same mistakes repeatedly after corrective instruction such as rough or painful Pap smear technique on GYN."

8. "Plaintiff has flattened affect, body language, disconnect from patient interaction and the appearance in many forms of being disinterested in doing food care for patients."

9. "There is faculty consensus that [Nigro] may be suffering from depression or poor career choice."

10. "Dr. Nigro was more interested in getting tasks done in order to leave than in caring for the medical issues presented."

Appellant's Br. 34-36.

Statements (1), (4), (5), (6), and (8) are opinions and therefore not actionable under Virginia law. See Chaves v. Johnson, 335 S.E.2d 97, 101 (Va. 1985) ("Pure expressions of opinion, not amounting to 'fighting words,' cannot form the basis of an action for defamation."). Nigro attempts to circumvent this general rule by relying on Fuste v. Riverside Healthcare Association, 575 S.E.2d 861 (Va. 2003), which held that "defamatory words that prejudice a person in his or her profession or trade are actionable as defamation per se." Id. at 861 (quotation marks and alterations omitted). Nigro's

19

reliance is misplaced, however, because it assumes the matter at issue--that statements of opinion can be defamatory. But as the Virginia Supreme Court has explained, statements that do "not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person" are opinions and therefore not defamatory. Yeagle v. Collegiate Times, 497 S.E.2d 136, 137 (Va. 1998) (footnote omitted). Dennehy's statements regarding Nigro's lack of progress and apparent disinterest are expressions of opinion because they are based on his perceptions of her performance and cannot be proven false.

Statements (2), (3), and (7) are not sufficiently harmful to be defamatory. We acknowledge that statement (2)--that Nigro failed NICU--is technically false, despite Dr. Lee's statement that she would have failed in a different year and that part of why she passed was because the rotation did not want her back. Nonetheless, looking to our precedent in Chapin, we do not find any of these statements defamatory because we cannot conclude that they would "deter third persons from associating or dealing with" Nigro or make her "appear odious, infamous, or ridiculous." Chapin, 993 F.2d at 1092. As alleged, the statements suggest that she still had much to learn as a resident. The very point of residency is to serve as a training vehicle allowing the resident to benefit from guidance and

20

instruction. For this reason, none of these statements can prejudice her in her profession so as to be actionable per se, nor do they satisfy Chapin's test.

Finally, statement (9)--Dennehy's claim that there was faculty consensus that she was suffering from depression or a poor career choice--is not defamatory because it is true, as borne out by the fact that the faculty voted unanimously not to renew her contract. That some non-voting faculty members may have disagreed does not render the statement that there was a "consensus" false. Accordingly, we agree with the district court that Nigro failed to state a claim for defamation against Dennehy.

2.

Turning to allegedly defamatory statements made by other Program employees--(1) an alleged statement that Nigro "tapped telephones on Valley Health property" and (2) an alleged statement that Nigro "recorded conversations on Valley Health property"--we agree with the district court that these statements are not defamatory. As the Virginia Supreme Court has explained, "[c]ommunications between persons on a subject in which the persons have an interest or duty" are privileged. Larimore v. Blaylock, 528 S.E.2d 119, 121 (Va. 2000). It is indisputable that employees running the Program have an interest in ensuring that residents follow Hospital rules. "[A]n

21

employer, or his proper representatives, [must] be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer." Id. (quoting Chesapeake Ferry Co. v. Hudgins, 156 S.E. 429, 441 (Va. 1931)). "However, the privilege attaching to such occasions is a qualified privilege which may be defeated if the plaintiff proves that the defamatory statement was made maliciously." Id.

Even reading the evidence in the light most favorable to Nigro, she forecasts no evidence of malice with respect to these statements. We cannot assume, without any evidence, that hospital employees were not genuinely concerned about the Hospital's policy on taping. Since Nigro failed to show that there was a question of material fact on this issue, we find that summary judgment is appropriate.

C.

Nigro has sued Dennehy alone for intentional interference with contract. Normally, an employee of a contracting party cannot be liable for intentional interference with contract unless he acts outside of his scope of employment. Fox v. Deese, 362 S.E.2d 699, 708 (Va. 1987) (explaining that when an employee acts within the scope of his employment, his employer's "contract was also his contract, and he could not interfere with it"). To make this claim, Nigro has pled that Dennehy was

22

acting outside of the scope when he "caused [the Hospital] to issue the Notice of Non-renewal in violation of the procedures and later caused, through improper methods the issuance of the April 20 Memorandum which left [Nigro] with no option but to leave the Program." Appellant's Br. 43-44; Reply Br. 15-16. Nigro has offered no explanation of how Dr. Dennehy's acts toward her differ from or exceed his responsibilities as Program Director. We therefore find Nigro's claim that Dennehy was acting outside of the scope of his employment as Program Director to be an "unreasonable conclusion" that we need not credit. See Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). For this reason, her claim for intentional interference with contract must fail.

D.

Nigro's claim for Intentional Infliction of Emotional Distress similarly lacks merit. The Virginia Supreme Court has explained that to support such a claim, the conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Russo v. White, 400 S.E.2d 160, 162 (Va. 1991) (quotation marks omitted). "This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved."

23

*Ruth v. Fletcher*, 377 S.E.2d 412, 413 (Va. 1989) (internal quotation marks omitted). Nigro argues the Defendants knew that she had "an emotional disorder due to the rigors of the program" and that despite knowing this, "they proceeded to take an action which would obviously inflict emotional insult." Appellant's Br. 41-42. She analogizes her "emotional disorder" to the clinical depression suffered by the plaintiff in *Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999). The facts of *Baird* do not bear this out. There, the complaint alleged that a teacher "intentionally attempted to humiliate Baird, a child, knowing that she was suffering from clinical depression." *Id.* at 472. In fact, in *Baird* we found both that the teacher's actions prompted Baird to attempt to commit suicide and that the teacher's public humiliation of Baird increased after the suicide attempt. *Id.* at 465. We held that summary judgment was inappropriate on the plaintiff's intentional infliction of emotional distress claim because we could not say "as a matter of law, that the allegations in Baird's complaint do not allege facts so outrageous as to exceed the bounds of decent society." *Id.* at 472-73. The actions challenged here are both markedly different and significantly more benign.

Since Nigro claims that she is not depressed, but rather struggling with the rigors of the program, we find *Ellison v. St. Mary's Hospital*, 8 Va. Cir. 330 (Va. Cir. Ct. 1987) to be

24

more analogous.  There, a Virginia trial court explained that conduct such as criticizing an employee's work in front of others, saying that that employee has an attitude problem, giving that employee a choice between resignation and termination, and barring that employee from hospital grounds were not sufficiently outrageous to give rise to a claim for intentional infliction of emotional distress.  Id. at 332.  The court further warned that to make such allegations "actionable would be to create chaos in the work place" because employees are criticized about their job performance "every day."  Id. Such concerns seem particularly warranted in the field of medicine, where the consequences of poor performance are potentially dire.

E.

Nigro's claims against VCU, VHS, the Hospital and Dennehy under 42 U.S.C. § 1983 for violation of her Due Process rights also lack merit.  Nigro argues that allowing Dennehy to formulate the April 20, 2009, Probation Notice was a prejudicial departure from the residency program's Procedures.  She relies on Jones v. Board of Governors of U.N.C., 704 F.2d 713 (4th Cir. 1983), which held that "significant departures from stated procedures of government and even from isolated assurances by governmental officers which have induced reasonable and detrimental reliance may, if sufficiently unfair and

25

prejudicial, constitute procedural due process violations." Id. at 717. Even assuming that the Procedures entitled her to a particular process--a conclusion that we rejected in her breach of contract claim--we find no prohibition in the Procedures that would preclude Dr. Dennehy, as Director, from formulating an alternative plan. Nor does Nigro convincingly point to one. The relevant language says that the "subcommittee is free to uphold or reject the Residency Director's recommendations, or to formulate a new solution." By its terms, the language does not require the subcommittee to craft a proposal in the first instance. The delegation of that responsibility to Dr. Dennehy fits comfortably within the parameters of formulating a new solution. Seeing no prohibition, explicit or otherwise, against allowing the Director to craft a new plan, we find that allowing it does not violate the Procedures. In sum, the district court did not err when it found that Nigro's claims under § 1983 failed to state a claim on which relief could be granted.[3]

---

[3] Nigro makes several additional arguments in which she alleges that she was entitled to an impartial decision maker and, therefore, that Dennehy's involvement in the Program's decision not to renew her contract and subsequent decision to put her on probation and have her repeat her R-1 year violates her due process rights because he was not an impartial decisionmaker. She cites no support for this claim, perhaps because this circuit has explained that pre-termination hearings need not be held before an impartial decision maker. Crocker v. Fluvanna Cnty. Bd. of Pub. Welfare, 859 F.2d 14, 17 (4th Cir. 1988). Since Nigro was never terminated from the Program, she (Continued)

26

F.

Finally, the district court granted summary judgment in favor of the Defendants on Nigro's claims for gender discrimination and retaliation under Title VII. Since Nigro did not raise retaliation in her opening brief,[4] she has forfeited that claim.

In this circuit, "[u]nder Title VII, the plaintiff bears the initial burden of proving a prima facie case of discrimination by raising an inference that the defendant acted with discriminatory intent." Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998). We have recently explained that "[a]bsent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals, 626 F.3d

---

cannot claim that the decisions about which she complains were anything other than pre-termination decisions.

[4] Moreover, at oral argument, Nigro's counsel declined to pursue any suggestion that Nigro was retaliated against for falsifying her hours on the ACGME survey. As such an action—even assuming it occurred--would not make out a Title VII claim, we do not address it further.

187, 190 (4th Cir. 2010).  Nigro's claim fails because she has not demonstrated that her performance was satisfactory.[5]

As we reiterated in our recent decision in Halpern v. Wake Forest University Health Sciences, 669 F.3d 454 (4th Cir. 2012), "courts are particularly ill-equipped to evaluate academic performance."  Id. at 463 (quotation marks omitted).  In Regents of University of Michigan v. Ewing, 474 U.S. 214 (1985), the Supreme Court explained:

> When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

Id. at 225 (footnote omitted); see also Halpern, 669 F.3d at 462-63 (citing Ewing).  Nigro has not alleged that the faculty, which included several women, departed from any accepted academic norms as to demonstrate that it was not exercising its professional judgment when it voted unanimously not to renew her contract.  The record supports reading this vote as evidence that the faculty did not believe her performance as a resident to be satisfactory.  Although Nigro received many average

---

[5] Because we base our decision on this prong, we need not address Nigro's contention that a similarly situated male was treated more favorably.

28

evaluations, significant concerns were expressed that she did not appear to care about her patients, that she was doing the bare minimum to pass, that her knowledge lagged behind her peers, and that she was unwilling to take responsibility for her shortcomings. Indeed, most of her best marks were for non-substantive criteria, such as appropriate dress. We note, for example, that her evaluations from her NICU rotation say that she passed only because the department did not want her back. Since we must view the faculty's determination that Nigro performed unsatisfactorily with considerable deference, Halpern, 669 F.3d at 462-63, and the record contains ample evidence that her performance in some rotations was deficient, we cannot conclude that she has met her burden of showing that she performed her job satisfactorily. Since Nigro has failed to state a prima facie case of discrimination, we affirm the district court's grant of summary judgment on this claim.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

29