John Doe, appellant, v. Board of Regents of the
University of Nebraska et al., appellees.
___ N.W.2d ___

Filed April 24, 2014.    No. S-12-1136.

1.  **Summary Judgment.** Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2.  **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

3.  **Federal Acts: Discrimination: Claims.** Because the Americans with Disabilities Act of 1990 sets forth the same remedies, procedures, and rights as the Rehabilitation Act of 1973, claims brought under both acts are analyzed together.

4.  **Federal Acts: Discrimination: Public Officers and Employees: Immunity.** Government officials cannot be sued in their individual capacities under either title II of the Americans with Disabilities Act of 1990 or the Rehabilitation Act of 1973.

5.  **Summary Judgment: Proof.** A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming the evidence went uncontested at trial, would entitle the party to a favorable verdict.

6.  **Summary Judgment: Evidence: Proof.** After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion.

7.  **Federal Acts: Discrimination: Proof.** The burden of proving discrimination under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 remains always with the plaintiff.

8.  ____: ____: ____. The burden of production in an action under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 shifts between the parties under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

9.  ____: ____: ____. A student bringing action under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 for discrimination by an educational institution and its officers in their official capacities must first make out a prima facie case by proving (1) that he or she was disabled within the meaning of the acts; (2) that he or she otherwise was able, with or without accommodations, to meet the academic and technical standards requisite to admission and participation in the school's education program; and (3) that he or she suffered an adverse action because of his or her disability.

10. ____: ____: ____. Once a prima facie case of discrimination is made under the Americans with Disabilities Act of 1990 or the Rehabilitation Act of 1973, the

burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse action. Upon such articulation by the defendants, the burden shifts back to the plaintiff to produce evidence that the stated nondiscriminatory reason is a pretext for discrimination.

11. **Federal Acts: Discrimination.** If the defendant did not know of the plaintiff's disability, then the defendant cannot be liable under the Americans with Disabilities Act of 1990 or the Rehabilitation Act of 1973.

12. **Discrimination: Mental Health.** Mental disabilities are rarely open, obvious, and apparent.

13. **Federal Acts: Discrimination.** Under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, adverse actions because of discrimination include failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.

14. **Discrimination: Proof.** The plaintiff claiming discrimination based on a failure to accommodate must identify a specific reasonable accommodation or accommodations that would allow the plaintiff to perform under the program at issue.

15. **Discrimination: Liability.** When a program provides reasonable designated channels through which participants must notify the program of a disability and the requested accommodations, then the program is not liable for a failure to accommodate unless the plaintiff utilizes those channels.

16. **Discrimination.** The element of adverse action may be something short of termination or dismissal from a program, but there must be materially adverse consequences affecting the terms, conditions, or privileges under the program, such that a reasonable trier of fact could find objectively tangible harm.

17. ____. Adverse action may be properly based on conduct even where that conduct is related to the disability.

18. **Federal Acts: Discrimination.** In actions under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, substantial deference is generally given to academic judgments.

19. **Colleges and Universities: Courts.** Courts are generally ill equipped, as compared with experienced educators, to determine whether a student meets a university's reasonable standards for academic and professional achievement.

20. ____: ____. Evaluating performance in clinical courses is no less an academic judgment than that of any other course, and is entitled to the same deference.

21. **Discrimination: Proof.** A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason.

22. **Colleges and Universities: Courts.** The deference extended to academic decisions extends also to the procedural requirements surrounding those decisions.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

John Doe, pro se.

Amy L. Longo and Lawrence K. Sheehan, of Ellick, Jones, Buelt, Blazek & Longo, L.L.P., for appellees.

Heavican, C.J., Connolly, McCormack, Miller-Lerman, and Cassel, JJ.

McCormack, J.

## I. NATURE OF CASE

The plaintiff, known as John Doe, brought suit under title II of the Americans with Disabilities Act of 1990 (ADA)[1] and § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act)[2] against the defendants. Doe, representing himself pro se, alleged that the University of Nebraska Medical Center (UNMC), the Board of Regents of the University of Nebraska, and several members of UNMC's staff, in their official and individual capacities, discriminated against him while he was a medical student at UNMC, because of his chronic and recurrent depressive disorder disability. The district court dismissed the staff in their individual capacities and granted summary judgment in favor of the remaining defendants. Doe appeals.

## II. BACKGROUND

### 1. Placed "On Review" for Poor Performance Freshman Year at UNMC

Doe started medical school in August 2003. He was placed "On Review" shortly thereafter for weak performance in structure and development of the human body core. According to the Scholastic Evaluation Committee (SEC) guidelines, a student is placed "On Review" when the student's performance is marginal during the course of the academic year. This may include, but not be limited to, performance on a single examination (exam) or performance in a core or clerkship. Doe was again informed that he was "On Review" at the end of the first semester of his first year, for receiving a grade of "Marginal" in structure and development of the human body core.

In letters informing Doe of his "On Review" status, Doe was referred to various support services of the academic success

---

[1] 42 U.S.C. § 12131 et seq. (2006).

[2] 29 U.S.C. § 797(a) (2006).

program and of student counseling, as well as a tutoring program through the office of admissions and students. He was also encouraged to speak with Dr. Jeffrey W. Hill, the associate dean for admissions and students.

### 2. Rescheduled Exam After Fiance Troubles

At the end of his freshman year of medical school, Doe asked to reschedule his comprehensive first-year exam. Doe's wedding had been scheduled to take place around that time. Doe asked to delay the comprehensive exam, because he decided to postpone the wedding. Doe met with Hill and explained that he was having "apprehensions about getting married," which were causing Doe "stress." Doe explained to Hill that his fiance would not wait until after the exam to work on issues they were having in their relationship and that this was "very difficult, stressful, and draining to me both emotionally and physically." That difficulty was combined with Doe's "anticipatory stress" of his decision to tell his fiance he wanted to postpone the wedding—after her parents had already spent "a lot of money" on the event. Doe thought this "taxing" situation would "affect [his] performance on the comprehensive exam." Doe was allowed to postpone the exam, which he later passed.

### 3. More Exams Rescheduled Sophomore Year

The comprehensive first-year exam was the first of several exams that Doe postponed until a later date. Dr. Gerald Moore, the senior associate dean for academic affairs, stated that he met with Doe on two or three occasions during Doe's first 2 years of medical school "because of his frequent delay of exams."

According to Moore, when he asked Doe whether he was experiencing any problems, Doe stated only that he was having problems with his girlfriend. Doe never told Moore he had a disability. Doe claimed that when he postponed an exam twice in October 2004, he told Moore he was "depressed" and having trouble sleeping and concentrating.

Doe went to see a psychiatrist, whom Doe saw only once. Doe obtained prescriptions for antianxiety and antidepressant medications. The psychiatrist diagnosed Doe with adjustment disorder with depressed mood, but Doe did not convey this diagnosis to UNMC.

By December 16, 2004, Moore informed Doe that his rescheduling of exams "was not professional behavior for a future physician" and that he would not be allowed to delay future exams.

Around that time, Doe's ex-fiance began dating someone else, which caused Doe further distress. In January 2005, Doe's grandmother died.

### 4. Diagnosed With Major Depressive Disorder

In January 2005, Doe saw a different psychiatrist, Dr. Rafael Tatay, who diagnosed Doe with chronic and recurrent major depressive disorder. Tatay recommended that Doe engage in psychotherapy and prescribed antidepressants and antianxiety medications. Tatay explained that other than Doe vaguely mentioning in their first meeting that he could not concentrate, "[m]edical school was not an issue" for Doe: "[T]he main issue of this person was with the interpersonal relationships, with depression." Tatay saw Doe in January, May, and August 2005. After that, Tatay did not see Doe until 2007.

Doe also spoke occasionally with Dr. David Carver, who is a psychologist and the director of the counseling and student development center at UNMC. Carver averred that he met with Doe in May 2004, April 2005, and September 2006. In these meetings, Doe discussed the breakup with his fiance and his academic performance. At one meeting, Doe mentioned to Carver that he saw a psychiatrist and a doctor over the course of the breakup with his fiance and the death of his grandmother. Carver averred that he was never aware, however, that Doe had been given a psychiatric diagnosis of major depression. Doe testified he thought he had told Carver about "being depressed."

### 5. Doe Did Not Claim Disability at
### Office of Services for Students
### With Disabilities

Determinations at UNMC of whether a student has a disability and what accommodations may be required are made by the office of services for students with disabilities, a subdivision of the counseling and student development center at UNMC. The center informs incoming medical students about these services during orientation, and this information is also included in the student handbook and on the UNMC Web site.

The policies of the office of services for students with disabilities are posted on its Web site, in the student handbook, and in the flyer in the orientation materials provided to all incoming enrolled students. The policies state that in order to be eligible for academic or physical accommodations, a student must contact the student counseling center and fill out an application for disability accommodation well in advance of the time for which the accommodation is needed. Underlined and in boldface, the policies state that faculty will not be expected to provide accommodation without a letter from the student counseling center verifying eligibility for accommodations and setting forth an accommodation plan.

It is undisputed that during his enrollment at UNMC, Doe never contacted the office of services for students with disabilities and never requested accommodations through the procedures set forth by that office.

Doe explained that while he was in medical school, he did not think of his major depressive disorder as a "disability" and did not consider himself "disabled." When, after this lawsuit was filed, Doe was asked what type of accommodations he requires because of his disability, Doe stated that that would depend on the time and the situation.

### 6. Doe Granted Leave of Absence
### for Wedding-Related Issues

On January 21, 2005, Doe requested a leave of absence from the medical school. Doe requested permission to postpone his neurology/ophthalmology/psychiatry core to the summer before his junior year. Doe explained that he had been "trying

to find resolution" with canceling his wedding and that his grandmother had recently passed away.

The SEC granted Doe a leave of absence. The original letter granting leave stated it would be from January 21 to February 6, 2005, but it appears that the leave lasted the entirety of Doe's second semester. The SEC guidelines provide for a leave of absence "under exceptional circumstances," "for academic, medical, and personal reasons." Under the guidelines, a student will be required to return from a leave of absence no later than the beginning of the next academic year.

In the letter communicating the leave of absence to Doe, Hill informed Doe that he could postpone the neurology/ophthalmology/psychiatry core, but would not be allowed to postpone any other exams for the remainder of the academic year. Hill stated in the letter that Doe had postponed exams several times in the previous semester and that "this cannot be tolerated in the future." Doe later asserted that these statements "suggested to me that I would no longer be accommodated for my depression/disability when I returned [from] my [leave of absence]."

Hill stated that the SEC did not grant the requested leave of absence because of alleged major depressive disorder or any other alleged disability. In fact, Hill averred that at no point in his interactions with Doe did Doe inform him that he had major depressive disorder or any other disability.

Doe testified in his deposition that he talked to Hill about "being depressed." Doe had stated in a prior affidavit that he told Hill of his diagnosis of major depressive disorder and told Hill that he was taking medications.

Doe testified that he met with the SEC during his leave of absence and that it "seem[ed] like [his depression] did come up." But Doe could not ultimately remember what was or was not said.

### 7. Doe Completed Sophomore Year With Specially Arranged Summer Core

The SEC determined, after much discussion, to grant Doe's request to take the neurology/ophthalmology/psychiatry core

in the summer before the start of his junior year. Hill explained that, typically, a student taking a leave of absence would have to come back and repeat the missed core at the same time the following year. A student cannot take the required "USMLE Step 1" exam until that missed core has been completed, however, and, under the SEC guidelines, the USMLE Step 1 exam must be taken before entering the junior-year clerkships. According to Hill, the physician who taught the core agreed to teach it to Doe over the summer, "so we could kind of keep him with his class and keep things moving along and so he didn't have to wait a whole year to take that core." Hill said that such a special summer arrangement was something UNMC had never done before, that it was inconvenient for the teaching physician, and that it was something that UNMC was not going to do again. Doe thus successfully completed his sophomore year the summer following his leave of absence.

### 8. DOE SIGNED JUNIOR-YEAR PROFESSIONALISM STATEMENT

Before entering his junior year, Doe, as required of all medical students before entering their junior year, signed a "Professionalism Statement." The Professionalism Statement explained that any deviations of professional behavior are noted by attendings and lecturers, during class or in a clinical setting, and that faculty are required to report such deviations to the associate dean for admissions and students. In addition, the statement explained that unprofessional behavior will put the student at risk of failing clerkships or having the grade lowered.

### 9. DURING JUNIOR YEAR DOE FAILED TWO CLERKSHIPS AND RECEIVED MARGINAL IN ONE CLERKSHIP

During his junior year, Doe had pediatrics, internal medicine, obstetrics and gynecology (Ob/Gyn), family medicine, and psychiatry clerkships. He received grades of pass or better in his psychiatry and family medicine clerkships. But Doe received a grade of fail in both his internal medicine and his

Ob/Gyn clerkships. He received a grade of marginal in his pediatrics clerkship.

### (a) Ob/Gyn Clerkship

Dr. Sonja R. Kinney, director of the Ob/Gyn clerkship, sent Doe an e-mail on January 25, 2006, advising him of unprofessional conduct observed by faculty and resident physicians, in the hopes that he could improve his clinical performance. That e-mail stated that "[r]esidents noted your playing internet poker on labor and delivery, attendings noted leaving during clinic time to get concert tickets, and staff noted your absence this morning at teaching conferences." Kinney stated that Doe's performance did not improve following his receipt of this e-mail.

Doe received a scaled percentile score of 64 on the Ob/Gyn "shelf" exam, which was the 12th percentile for his class. Anything less than 10th percentile is considered failure of the shelf exam, so this was considered a pass. But students receive a grade of fail for the clerkship if they do not meet minimum criteria for the clinical component of the grade, regardless of the shelf exam score. Doe received a fail for his clinical component.

The comments on his grade sheet stated that Doe "was notably absent from or late to required activities and frequently did not complete tasks as assigned." He had difficulty presenting patients and fielding questions, and he had a below-average knowledge base. The comments further stated that after being notified of professionalism issues, Doe continued to have incidents, including weak performance during service, failing to show up for a session without excuse or explanation, sometimes being abrupt with patients, and having a knowledge base that was "'greatly lacking.'" The comments stated that Doe was frequently absent or late to clinical rounds and didactic teaching sessions, left a clinic early to pick up concert tickets without explanation, played games on his computer during downtime on labor and delivery, did not go home and change when asked to do so because of casual attire, and generally "'gave impression that he did not seem interested in seeing patients or learning from faculty.'" The comments further

stated, "Overall he showed a pattern of lack of concern for his professional role . . . ."

After receiving his grade, Doe discussed it with Kinney. Doe generally denied that most of the events referred to in the grade sheet or the previous e-mail referred to him—he asserted he had been confused with a different student. Doe admitted, however, that he had left the clinic room to get concert tickets in the midst of taking a patient history. Doe explained, "'[W]ell you know, I have a life outside the hospital.'"

Kinney averred that throughout the course of monitoring Doe's clinical performance on the Ob/Gyn clinical service, she "treated John Doe in the same way I would treat any student having comparable performance problems." Indeed, according to Kinney,

> [a]t no time while John Doe was on the Ob/Gyn clerkship through the appeal of his grade did I perceive that John Doe had a disability. John Doe never notified me of any facts suggesting he was disabled, and I was never informed by John Doe of any accommodations he required because of an alleged disability.

Doe stated that he did not remember whether he ever told Kinney he had a disability.

Doe appealed his grade, complaining that the Ob/Gyn process allows a "single person that has strong oppositional feelings against a student to have profound effects on the outcome." He complained that he did not receive copies of all the relevant evaluation forms from the faculty. Doe characterized the summary of the comments on his grade sheet as "obscure and hardly justifiable."

The appeal was unsuccessful. The SEC concluded that Doe did not show by the weight of the evidence that the grade/evaluation in the Ob/Gyn clerkship was improper or unfair.

Dr. Carl V. Smith, the chair of the Ob/Gyn department, stated that he had spoken with Doe about his grade and the appeal process. Smith stated Doe never informed him that he had a disability or that he required an accommodation for a disability. Smith averred that he treated Doe as he would have treated any other student and that all his actions concerning Doe were in good faith.

Doe testified that his experience with the Ob/Gyn clerkship and the unsuccessful appeal "had a big impact" on him. Doe explained that it was "very stressful," especially "because they didn't do any evaluations and they were claiming that I did stuff that didn't happen."

### (b) Internal Medicine

The attending evaluations for Doe's internal medicine clerkship were at a passing level. However, Doe failed the "OSCE" and national shelf exams, and he had "weak performance in other areas." Doe accordingly received an overall grade of fail for the clerkship.

According to Doe, Dr. David O'Dell, the internal medicine clerkship director, told Doe he could not appeal his grade, because he had failed the shelf exam and "that's an automatic failure of the class." O'Dell denied ever telling Doe he could not appeal. O'Dell stated that he did tell Doe that "he would be better served if he repeated the Internal Medicine Clerkship."

O'Dell averred that at no time did Doe tell him he was disabled. Nor did O'Dell have knowledge of any facts that led him to believe Doe was disabled. Doe did not ask O'Dell for accommodation of any alleged disability. O'Dell averred that all of his actions concerning Doe were "in good faith performance of my duties as a faculty member of the College of Medicine."

Doe admitted that he did not recall specifically talking with O'Dell about being depressed. But Doe stated that because O'Dell was on the SEC when it approved his leave of absence, he assumed O'Dell was "aware of the situation."

### (c) Pediatrics

Doe received a grade of marginal for his pediatrics clerkship, principally because Doe did not receive the required minimum score on the "NBME Subject Exam."

Doe's clinical grade for the clerkship was 2.79 out of 4.00. The "*Comments for the Student*" section of the evaluation form stated that attendings had observed that Doe needed to work on developing therapeutic plans. Furthermore,

"[a]s was discussed during the clerkship, you also need to be sure you are communicating with the appropriate individuals for absences."

In a letter to Hill on December 14, 2006, Dr. Sharon Stoolman, the director of undergraduate medical education for the department of pediatrics, explained that Doe exhibited "unpredictable behavior." Stoolman illustrated that Doe once missed 2 days on inpatient rounds without proper notification and that she resorted to calling Doe's parents when she was unable to reach him by cell phone or e-mail. Doe denied missing days for anything other than illness. He further alleged that he always notified his supervising physician in person or by e-mail.

Stoolman averred that at no time did Doe tell her that he had a disability or that he required accommodation for a disability. Stoolman said that she did not suspect that Doe suffered from depression—"I mean, not any more than any of the other medical students." Doe admitted that he did not tell Stoolman that he suffered from depression the first time he took the pediatrics clerkship. He was, in fact, uncertain to what degree he was depressed at that time.

## 10. Doe Asked to Sign Academic Contract

The SEC determined that Doe would have to repeat his junior year because he received grades of two fails and one marginal during that year. The SEC guidelines list one of the primary justifications for requiring repetition of an entire academic year as two or more grades of fail during the same academic year. When the SEC made its determination, Doe was participating in a family medicine community preceptorship in Fremont, Nebraska.

Doe was asked to sign an academic contract setting forth the conditions for repeating his junior year and the requirements for his continued enrollment. The agreement required Doe to retake all junior clerkships except family medicine. The agreement specified that Doe must receive grades of pass or better in the required repeated clerkships, that he would receive a grade of pass or better on his current family medicine

clerkship, that he would receive grades of pass or better in all senior electives, that he would meet regularly with the student counseling center for assistance with any academic and/or personal issues that arise, and that he would meet regularly with Hill after each clerkship to assess academic progress.

### 11. Doe Refused to Sign
#### Academic Contract

Doe initially refused to sign the agreement. Hill remembered that Doe had said he could not come in to sign the contract because he was on a family medicine rotation in Fremont.

Eventually, Doe met with Hill. According to Doe, "I told Dr. Hill . . . that I was depressed and I wanted to get help, talk to Dr. Carver, get the necessary help that I needed before I signed anything." Doe also sent Hill an e-mail stating in pertinent part:

> Although I feel like I'm moving forward again, I'm certainly not were [sic] I would like to be. The challenges set before me aren't meager, and if I want to succeed I will need to utilize all of my resources including Dr. Carver. This obviously hasn't happen[ed] yet because I've been in Fremont but I would like the opportunity to take the necessary measures to be successful. I'm concerned that just the desire to excel without addressing the above issues has not been sufficient to achieve my goals in the Family Medicine clerkship.

Doe apparently considered this a request for accommodations and asserted that "Dr. Hill refused to address my mental health and my request for an accommodation and said that if I didn't sign the contract on that day, the matter would be brought before the SEC."

Doe did not sign the contract that day. According to Hill, Doe did not state he was disabled, nor did he request accommodations.

### 12. SEC Added Professionalism
#### Clause to Academic Contract

Doe was brought before the SEC. Doe could not remember what, if anything, he said to the SEC as an explanation of why he had not signed the contract as the SEC required.

The SEC revised the agreement so that it contained a professionalism clause. The professionalism clause stated that Doe understood that "any ratings of −2 or below on the professionalism ranking system, coupled with any negative comments concerning professional behavior, on any required clerkship or senior elective will be grounds for termination of enrollment."

According to Dr. Robert T. Binhammer, chair of the SEC, the SEC decided to add the professionalism requirement to the contract because unprofessional conduct had been observed by clerkship directors. Hill noted that this clause was added after Doe's initial refusal to sign the document. The SEC considered Doe's failure to sign the original contract "a major breach of professionalism." Thus, the SEC reconsidered the previous documented instances of unprofessional conduct in light of that major breach.

The SEC guidelines provide that the only acceptable grade for a core or clerkship being repeated is a pass: "A grade of Marginal or Fail upon repetition is not acceptable and will result in termination of enrollment." (Emphasis in original.) The SEC guidelines for UNMC further provide that "[a]ny student, who by quality of work, by conduct, or other reason indicates unfitness to enter the practice of medicine, may be dismissed from the College." The guidelines are to be considered in light of each student case and will be considered on its own merits. The guidelines' "Termination of Enrollment" section lists failure to obtain a grade of pass in a repeated core, clerkship, or elective as one of several criteria considered justifying termination. That list also includes "[d]ocumentation of repeated unprofessional behavior."

In October 2006, Doe signed the revised agreement under threat of dismissal. Hill had a conversation with Doe when he finally came in to sign the revised academic contract. Hill remembered that Doe said only that "he wanted to see Dr. Carver." Doe did not inform him he had a disability.

### 13. General Practices Concerning Academic Contracts

Doe presented evidence that from August 2003 through 2008, UNMC required 43 of its students to repeat an academic

year. This was, on average, approximately 9 students per year. The vast majority of those students were asked to repeat their freshman year. Only three students were required to repeat a year other than their freshman year.

Only six of the students during that period who were required to repeat a year were required to sign an academic contract with UNMC for continued enrollment. No student with a documented disability and who was required to repeat a year was required to sign an academic contract for continued enrollment.

Of the students required to sign an academic contract, only the contracts for upperclassmen had requirements pertaining to current clerkships or other courses or clerkships beyond the academic year being repeated. No student, besides Doe, was required to sign a professionalism clause. There was no evidence, however, that any other student had ever refused to sign a proposed academic contract.

Binhammer explained that each academic contract is individualized to meet the needs of the student and that there is "no set contract for all students." And, according to Hill, "professionalism issues arise very rarely."

### 14. Doe Performed Poorly in Plastic Surgery Rotation

Doe began the remediation of his junior year with his surgery rotations. Doe received all acceptable professionalism marks, with one −1, in his general surgery rotation. He received all −1 marks in his emergency room surgery rotation. Doe's plastic surgery rotation went more poorly. Doe received ratings of −2 or below on the professionalism ranking system, coupled with negative comments concerning professional behavior, which was a violation of the academic contract he signed.

Doe's plastic surgery rotation began on a Monday, October 9, 2006. Doe claimed that on Wednesday, October 11, Dr. Michael L. Spann, a fellow in the plastic and reconstructive surgery program, "did not show up for rounding for which he had required the [sic] me to attend." According to Doe, when Doe later asked Spann about not showing up, Spann "maligned" him in front of a faculty plastic surgeon who was

nearby. According to Doe, Spann later explained to Doe that Spann was actually upset because "the attending had overheard me ask [Spann] about not being at rounds that morning and he was worried that the Faculty Plastic Surgeon would find out that [Spann] had been at home sleeping."

Spann confirmed that on October 11, 2006, he did not attend 6 a.m. rounds, but stated, "However, my absence should not have prevented [Doe] from rounding with the residents on this service." Spann generally denied that he was in any way embarrassed by Doe or that he had told Doe anything to that effect.

Doe stated he began to feel ill by that Sunday, and was unable to work the following Monday and Tuesday because of pain from an umbilical hernia. Doe scheduled surgery for Friday at 4 p.m., after the scheduled surgery shelf exam at 8 a.m. Doe knew he would not be able to eat or drink anything beginning at midnight of Thursday, but he wanted to take the exam before his surgery anyway. Doe went to work on Wednesday and Thursday of that week.

Spann informed Doe on Thursday that he would need to go on rounds the next morning—which was the morning of Doe's exam and his surgery. Doe did so. He arrived at 6:30 a.m. and was released at 7:20 a.m., before either the exam or the scheduled surgery.

Spann stated that he required Doe to go on rounds with him that morning "to provide him the opportunity to demonstrate the ability to evaluate a surgical patient, formulate a care plan and discuss surgical principles, as was standard to the academic process." Spann had determined that because of Doe's poor performance during the rotation, it was "imperative that he demonstrate the ability to evaluate a surgical patient, formulate a care plan, and discuss surgical principles before moving to another service."

Doe testified that because he lived far away, he had to get up at 4:30 a.m. to get to rounds on time. According to Doe, that "changed the whole scenario." Doe did not take the shelf exam.

In an e-mail to Dr. Wendy J. Grant, the associate director of the medical student clerkships in the department of

surgery, Spann summarized Doe's performance during the 2-week plastic surgery rotation. Spann wrote that Doe "continually demonstrated a lack of responsibility to the service and his education." Doe failed to show up for rounds one day, claiming that he did not know he was supposed to be there, even though Spann's recollection was that they had discussed Doe's required presence the afternoon before. Doe generally demonstrated "critical weaknesses in many areas," including "knowledge base, communication, responsibility, motivation, and patient care." In a professionalism checklist, Spann gave Doe the lowest score of –3 in four out of six areas listed on the checklist.

Spann averred that Doe never informed him that he had a disability, and Spann had no knowledge of any facts which led him to believe Doe had a disability. Grant similarly averred that she had no knowledge of any facts leading her to believe Doe had a disability, that Doe never informed her he had a disability, and that Doe never requested an accommodation of a disability. Grant averred, "I treated John Doe as I would treat any student who acted in a manner similar to John Doe." Doe did not deny that Spann and Grant were not informed he had a disability.

Doe's failure to timely notify the surgery department that he would not be taking the shelf exam as scheduled eventually led to the SEC's being notified of the poor professionalism mark by Spann. Hill determined that Doe's poor professionalism on the surgery clerkship violated the conditions of his continued enrollment, and Doe was invited to a meeting of the SEC to explain what happened.

## 15. SEC Terminated
### Doe's Enrollment

Before the SEC meeting, Doe sent a letter to Binhammer and Hill, summarizing his position. Doe complained that the professionalism clause of his academic contract was most likely due to issues with his Ob/Gyn clerkship, and he alleged that persons involved with the Ob/Gyn clerkship were on the SEC at the time he was asked to sign the contract. According

to Doe, "the decision of the committee held me accountable for previous unsubstantiated issues." Doe said that "these issues have not been resolved and continue to impact me in a devastating way."

Doe then reiterated to the SEC his procedural complaints regarding the Ob/Gyn grade. He complained, for instance, that his grade evaluations from faculty and residents were never shown to him. He reiterated his belief that those evaluations never actually existed. Doe also presented cell phone records in an attempt to disprove some of the Ob/Gyn allegations that Doe did not show up for work or went missing during rounds.

With regard to Spann's decision to make Doe go on rounds the day of the exam and his surgery, Doe wrote:

> I was put in a horrible situation; that I believe was unfair. I was NPO from midnight on Thursday, I was taking Vicodin for abdominal pain, I had to get up at 4:30 AM to be at UNMC in time to round, I was expected to take a test at 8:00 AM, and undergo surgery in the afternoon.

Neither in his letter nor during the meeting before the SEC did Doe allege he had a disability. Binhammer denied having any knowledge that Doe was even depressed and averred the SEC was never informed Doe had a disability. Doe said he had discussed his "depression" with Hill prior to the meeting and with "other people associated with the SEC," whom he could not name. But Doe also said that at this time, "I'm trying to still be strong and not admit that I'm depressed."

The SEC concluded that Doe violated the professional responsibility clause of his continued-enrollment agreement. The SEC determined that Doe's enrollment should be terminated effective November 7, 2006.

Hill testified that the reason for this decision was primarily the fact that Doe received four –3 ratings in his plastic surgery rotation. Hill did not believe that Doe's missing the surgery shelf exam had any role in the SEC's decision to terminate Doe's enrollment at UNMC. Doe never received a final grade for the surgery clerkship.

O'Dell left the SEC meeting early because he had to teach an 8 a.m. class. As he left, O'Dell informed the secretary of his vote for dismissal.

Doe appealed the SEC's decision to the "Appeal Board."

### 16. Remediation of Pediatrics Clerkship While Appeal Pending

While Doe's appeal to the board was pending, Doe was allowed to repeat his pediatrics clerkship. Although the grade was never entered on his transcript because it was compiled after his termination of enrollment, the final grade for the second time Doe took the pediatrics clerkship was a marginal. This was principally due to his clinical score.

Stoolman communicated concerns about Doe to Hill on December 14, 2006. In her letter, Stoolman said Doe's behavior during the clerkship was "erratic." Doe made "incorrect and inappropriate comments to fragile patients." Doe missed rounds on several occasions, telling other medical students to tell the attending that he was looking for his backpack. Doe was absent from a required group activity both weeks it was offered, and his excuses could not be verified. Doe "simply disappeared for several hours at a time and then reappeared right before check out rounds in the evening." Doe then missed a meeting with Stoolman to discuss his unexcused absences. Stoolman described that she waited for Doe for 2 hours and that he was not where they were planning to meet, not where he had told others he would be, and not where he later told her he was.

Stoolman stated, "I wish [Doe] had been able to be honest and ask for help in whatever it is that he is struggling with, but he has denied any problem other than the stress of being expelled." Stoolman explained that she had met with Doe in an attempt to help him understand that his "actions, behavior and absences were unacceptable," but that she had "tried and failed to help him see this." Stoolman averred that Doe never told her he had any type of disability and that Doe "had no understanding that his performance was unacceptable."

Doe testified that he told Stoolman during his remediation of pediatrics that he "was dealing with depression." Doe testified

that Stoolman told him at that time that if there was anything she could do to help, to let her know. He did not let her know what she could do to help.

Doe generally denied the allegations of unexcused absences, explaining that some absences were due to meetings pertaining to his appeal of the SEC's decision to discharge him. Doe asserted that despite efforts on his part, he was unable to schedule a meeting with Stoolman to clear up such misunderstandings.

### 17. Appeal Board Upheld Termination

Doe was represented by counsel at the hearing before the Appeal Board. Doe averred that it was only after he obtained counsel did he understand the definition of disability and his rights under the ADA and the Rehabilitation Act.

Doe explained to the Appeal Board that he had experienced a "bout of major depression" following a broken engagement. He explained that he took a leave of absence during his sophomore year "for treatment and recovery."

Doe explained the chain of events that he believed led to his unjust termination from UNMC. Doe said that because he had to make up a required core before taking the USMLE Step 1 exam, the start of his family medicine and surgery clerkships was delayed: "This put me at a disadvantage from the start because I was four months behind and the students I worked with had four extra months of critical experience . . . ."

Doe then described how he was "devastated" by the comments made about him on his Ob/Gyn clerkship evaluation. This was exacerbated by what Doe perceived as the procedural unfairness of the appeal process for his Ob/Gyn grade. Although that grade was no longer directly before the Appeal Board, Doe explained that "I do think it is important for the committee to understand that the grade I received for [the Ob/Gyn] clerkship was arbitrary and capricious and the ripple effect of the experience impacted me much more than just one grade."

This experience, Doe explained, "resurrected some of my depression symptoms." Doe said that while those symptoms

did not interfere with his ability to pass his psychiatry clerk-ship, his ability to manage all that was going on with the appeal of his Ob/Gyn clerkship "became too much" by the time he took his internal medicine exams.

Doe described that after his leave of absence, he was reluc-tant to sign the first version of the academic agreement because it encompassed the family medicine clerkship he was still undertaking: "Although the family medicine clerkship was going well, I felt my mental health was deteriorating and I was very concerned about the added pressure this agreement would impact my performance." Thus, Doe said, "I . . . advised Dr. Hill that I was very hesitant to sign an agreement that required a successful grade in family medicine." Doe did not think the addition of the professionalism clause was a fair response to his refusal to sign the first proposed agreement.

Finally, Doe described the situation surrounding his plastic surgery clerkship under the supervision of Spann. Doe said that "[d]espite my illness and scheduled surgery, I was going to try and take the test as scheduled to avoid any questions or controversy." But when Spann insisted that he go on rounds the morning of the test and of his surgery, Doe said, "the physi-cal and emotional weight of it all became too much for me." At that point, Doe explained, he sent an e-mail to the surgery department indicating he would not be taking the exam.

Doe questioned Spann's ability to grade Doe "objectively." Doe believed that Spann was preoccupied with defending his questionable decision to have Doe go on rounds the day of the shelf exam and Doe's hernia surgery. Doe asked the board to take this into account, as well as the fact that the evaluation was based on only 2 weeks of contact, 1 week of which Doe was sick.

Doe's presentation before the Appeal Board was the first time he disclosed his diagnosis of depressive disorder in writ-ing to an official committee of the UNMC College of Medicine. Specifically, Doe provided a medical progress note dated 15 days after the SEC's termination of his enrollment, indicating that Doe suffered from depression and was not sleeping well. Hill said that this was the first time he became aware Doe suf-fered from major depression or any other disability.

Doe asked the Appeal Board to give him a 6-month leave of absence. Doe explained he would like the opportunity to "really try to get things nailed down and stay on the antidepressants during the remainder of my time."

On December 19, 2006, the Appeal Board upheld the SEC's termination decision. According to Hill, no academic action was taken against Doe because he had a disability or was regarded as having a disability.

### 18. Dean of UNMC College of Medicine Upheld Termination

Doe thereafter appealed to the dean of the UNMC College of Medicine. In that appeal, Doe alleged that the SEC's termination of his enrollment under the professionalism clause was procedurally improper, because the SEC was not presented with both the rating of –2 or below on the professionalism ranking system and the negative comments concerning professional behavior. Doe also asserted that the membership of the Appeal Board was improper, that the information before the Appeal Board was not the result of its own investigation as required by the SEC guidelines, and that the Appeal Board forced Doe to defend his entire history with the medical school rather than just the incidents of unprofessionalism at issue. Doe did not make any reference to major depression or any other alleged disability.

Doe was not allowed to appeal the grades for his pediatric and surgery clerkships, because they were submitted after Doe's November 7, 2006, date of dismissal and were not included in his academic transcript.

The dean found no merit to Doe's appeal of the dismissal from the medical school.

### 19. Doe Sues

Doe sued UNMC, the Board of Regents, and several faculty members in their official and individual capacities. His original complaint alleged fraudulent concealment, violations of his substantive and procedural due process rights, breach of contract, and violations of title II of the ADA and the Rehabilitation Act. We disposed of the due process, fraudulent

concealment, and breach of contract claims in his first appeal to this court.[3] We disposed of an amended breach of contract claim in a later appeal.[4]

Doe filed an amended complaint on the ADA and Rehabilitation Act claims, asking for damages and injunctive relief. Following discovery and a hearing, the district court granted the defendants' motion for summary judgment. The court concluded that the actions against the defendants in their individual capacities were not cognizable under the ADA or Rehabilitation Act, and the court dismissed those defendants in their individual capacities from the action. The court then concluded that there was no material issue of fact supporting Doe's claims against the defendants in their official capacities or against UNMC and the Board of Regents. The court assumed for purposes of the summary judgment motion that Doe had a qualified disability under the ADA and Rehabilitation Act, but found no evidence supporting the inference that Doe was otherwise qualified to participate in the program at UNMC or that Doe was excluded on the basis of his disability. Doe appeals.

### III. ASSIGNMENTS OF ERROR

Doe assigns, consolidated and restated, that the district court erred in (1) granting summary judgment against him, (2) denying portions of his motions to compel, and (3) failing to sua sponte schedule a hearing relating to the defendants' alleged failure to comply with motions to compel that were granted.[5]

### IV. STANDARD OF REVIEW

[1] Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[6]

---

[3] *Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010).

[4] *Doe v. Board of Regents*, 283 Neb. 303, 809 N.W.2d 263 (2012).

[5] See *Harris v. O'Connor*, 287 Neb. 182, 842 N.W.2d 50 (2014).

[6] *Id*.

[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[7]

## V. ANALYSIS

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[8] Similarly, the Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[9]

[3] The ADA provides that the remedies and rights set forth in the Rehabilitation Act shall be applied to violations of title II. Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act, claims brought under both acts are analyzed together.[10] Despite the slightly

---

[7] *Id*.

[8] 42 U.S.C. § 12132.

[9] 29 U.S.C. § 794(a).

[10] See, e.g., *Thompson v. Williamson County, Tennessee*, 219 F.3d 555 (6th Cir. 2000); *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999); *Theriault v. Flynn*, 162 F.3d 46 (1st Cir. 1998); *Collings v. Longview Fibre Co*., 63 F.3d 828 (9th Cir. 1995); *Maddox v. University of Tennessee*, 62 F.3d 843 (6th Cir. 1995), *abrogated on other grounds*, *Lewis v. Humboldt Acquisition Corp*., *Inc*., 681 F.3d 312 ((6th Cir. 2012); *Doe v. University of Maryland Medical System Corp*., 50 F.3d 1261 (4th Cir. 1995); *Pottgen v. Missouri St*. *High Sch*. *Activities Ass'n*, 40 F.3d 926 (8th Cir. 1994).

different language these acts employ, they require a plaintiff to demonstrate the same elements to establish liability.[11]

[4] The district court correctly determined that Doe has no cause of action under the ADA and the Rehabilitation Act against the named individual faculty members in their individual capacities, and therefore correctly dismissed those individuals from the stated cause of action. Government officials cannot be sued in their individual capacities under either title II of the ADA or the Rehabilitation Act.[12] Title II, § 12131(1)(B), of the ADA is limited to actions by a "public entity," and a public entity is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." The Rehabilitation Act is limited to programs or activities receiving federal financial assistance,[13] which have been defined to include, as relevant here, a college, university, or other postsecondary institution.[14] Courts have determined that this provision limits enforcement under the Rehabilitation Act to the program receiving federal financial assistance and that it does not extend to enforcement against the employees who are the indirect recipients of such

---

[11] *Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454 (4th Cir. 2012).

[12] See, *Albra v. Advan, Inc*., 490 F.3d 826 (11th Cir. 2007); *Eason v. Clark County School Dist*., 303 F.3d 1137 (9th Cir. 2002); *Emerson v. Thiel College*, 296 F.3d 184 (3d Cir. 2002); *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98 (2d Cir. 2001); *Walker v. Snyder*, 213 F.3d 344 (7th Cir. 2000); *Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999); *Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999); *Hiler v. Brown*, 177 F.3d 542 (6th Cir. 1999); *Butler v. City of Prairie Village, Kan*., 172 F.3d 736 (10th Cir. 1999); *Calloway v. Boro of Glassboro Dept. of Police*, 89 F. Supp. 2d 543 (D.N.J. 2000); *Coddington v. Adelphi University*, 45 F. Supp. 2d 211 (E.D.N.Y. 1999). See, also, *Department of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 106 S. Ct. 2705, 91 L. Ed. 2d 494 (1986).

[13] 29 U.S.C. § 794.

[14] 29 U.S.C. § 794(b)(2)(A).

funds and who have no control over whether federal funds are accepted.[15]

We therefore consider the summary judgment order on the underlying merits as against UNMC, the Board of Regents, and the named faculty members in their official capacities. We hold that the district court was correct in finding no issue of material fact preventing summary judgment in their favor.

[5,6] A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming the evidence went uncontested at trial, would entitle the party to a favorable verdict.[16] After the movant for summary judgment makes such a prima facie case, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion.[17]

The evidence presented at the summary judgment hearing, if uncontested at trial, would entitle the defendants to a verdict in their favor. The defendants made a prima facie case that any adverse actions against Doe were for legitimate nondiscriminatory reasons. The only evidence to the contrary was Doe's assertion that the various incidents cited by faculty members in support of their negative professionalism assessments were false. This is not enough to show pretense under the burden-shifting rubric applicable to ADA/Rehabilitation Act claims. It is thus insufficient to rebut the defendants' prima facie case for summary judgment.

---

[15] See, *Emerson v. Thiel College, supra* note 12; *Lollar v. Baker*, 196 F.3d 603 (5th Cir. 1999); *Cox ex rel. Dermitt v. Liberty Healthcare Corp.*, 622 F. Supp. 2d 487 (E.D. Ky. 2008); *Montez v. Romer*, 32 F. Supp. 2d 1235 (D. Colo. 1999); *Purvis v. Williams*, 276 Kan. 182, 73 P.3d 740 (2003); *Doe v. Jamaica Hosp.*, 202 A.D.2d 386, 608 N.Y.S.2d 518 (1994). See, also, *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009).

[16] *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012); *Thone v. Regional West Med. Ctr.*, 275 Neb. 238, 745 N.W.2d 898 (2008).

[17] *Cartwright v. State*, 286 Neb. 431, 837 N.W.2d 521 (2013).

[7-10] The burden of proving discrimination under the ADA and the Rehabilitation Act remains always with the plaintiff.[18] The burden of production, however, shifts between the parties under the familiar *McDonnell Douglas Corp. v. Green*[19] framework.[20] A student bringing action under the ADA and the Rehabilitation Act for discrimination by an educational institution and its officers in their official capacities must first make out a prima facie case by proving (1) that he or she was disabled within the meaning of the ADA and the Rehabilitation Act; (2) that he or she otherwise was able, with or without accommodations, to meet the academic and technical standards requisite to admission and participation in the school's education program[21]; and (3) that he or she suffered an adverse action because of his or her disability.[22] Once such a prima facie case of discrimination is made, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse action. Upon such articulation, the burden shifts back to the plaintiff to produce evidence that the stated nondiscriminatory reason is a pretext for discrimination.[23]

[11] Many courts expressly include knowledge of the disability as one of the elements of the plaintiff's prima facie

---

[18] See, e.g., *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

[19] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[20] See, *Kosmicki v. Burlington Northern & Santa Fe R. Co.*, 545 F.3d 649 (8th Cir. 2008); *Mershon v. St. Louis University*, 442 F.3d 1069 (8th Cir. 2006); *Zukle v. Regents of University of California*, 166 F.3d 1041 (9th Cir. 1999).

[21] See 34 C.F.R. § 104.3(l)(3) (2014).

[22] See *Kosmicki v. Burlington Northern & Sanda Fe R. Co.*, *supra* note 20. See, also, e.g., *Childress v. Clement*, 5 F. Supp. 2d 384 (E.D. Va. 1998).

[23] See *Kosmicki v. Burlington Northern & Sanda Fe R. Co.*, *supra* note 20. See, also, e.g., *Falcone v. University of Minn.*, 388 F.3d 656 (8th Cir. 2004).

case.[24] All courts agree that if the defendants did not know of the disability, then they cannot be liable under the ADA or the Rehabilitation Act.[25] Courts find it logically impossible to adversely affect the plaintiff "because of" or "on account of" his or her disability if the defendant did not know the plaintiff was a member of a class of individuals considered disabled.[26] In other words, there can be no causation if there is no actual or constructive knowledge[27] of the disability. The ADA and the Rehabilitation Act do not require clairvoyance.[28]

[12] Several courts have explained that mental disabilities, such as alleged here, are rarely open, obvious, and apparent.[29] Knowledge of limitations or symptoms does not necessarily prove that the defendant knew the condition or symptoms were disabling, and this is especially true for many mental

---

[24] See, e.g., *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195 (6th Cir. 2010); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173 (6th Cir. 1996), *abrogated on other grounds*, *Lewis v. Humboldt Acquisition Corp., Inc.*, *supra* note 10; *Morisky v. Broward County*, 80 F.3d 445 (11th Cir. 1996); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451 (Iowa 1989).

[25] See, e.g., *Raytheon Co. v. Hernandez*, 540 U.S. 44, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996); *Morisky v. Broward County, supra* note 24; *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir. 1995); *Pace v. Paris Maintenance Co.*, 107 F. Supp. 2d 251 (S.D.N.Y. 2000); 2 Jonathan R. Mook, Americans with Disabilities Act: Employee Rights & Employer Obligations § 8.03[1][a] (2002).

[26] *Raytheon Co. v. Hernandez, supra* note 25; *Kocsis v. Multi-Care Management, Inc., supra* note 25; *Morisky v. Broward County, supra* note 24; *Hedberg v. Indiana Bell Telephone Co., Inc., supra* note 25; *Pace v. Paris Maintenance Co., supra* note 25.

[27] See, *Monette v. Electronic Data Systems Corp., supra* note 24; *Morisky v. Broward County, supra* note 24; *Miller v. National Cas. Co.*, 61 F.3d 627 (8th Cir. 1995); *Hedberg v. Indiana Bell Telephone Co., Inc., supra* note 25.

[28] See, *Miller v. National Cas. Co., supra* note 27; *Hedberg v. Indiana Bell Telephone Co., Inc., supra* note 25.

[29] See *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155 (5th Cir. 1996). See, also, e.g., *Miller v. National Cas. Co., supra* note 27; *Hedberg v. Indiana Bell Telephone Co., Inc., supra* note 25.

disabilities.[30] Thus, in other cases, courts have concluded that mere knowledge that the plaintiff had requested time off to deal with stress or depression was insufficient to prove knowledge of a mental disability.[31]

Doe's case largely fails because Doe's testimony that he told some of the faculty members he was "depressed" or "stressed" was insufficient to rebut their testimony that they had no knowledge Doe suffered from a disability. Vague or conclusory statements revealing an unspecified incapacity are insufficient to put the program on notice and charge it with knowledge of a disability.[32] Doe's claim based on the adverse action of failing to accommodate his disability certainly fails for such lack of knowledge, because the success of a failure-to-accommodate claim depends not only on the defendant's knowledge of the disability but also on the plaintiff's proper request for specific accommodations. Doe's litany of other alleged adverse actions, insofar as they are truly adverse actions, fail both for lack of knowledge and for the dearth of any evidence that the defendants' proffered legitimate academic reasons were pretextual. We will assume for purposes of this opinion that Doe was disabled and that he was otherwise qualified to participate in the program.

[13-15] We first address Doe's failure-to-accommodate allegation. Cognizable adverse actions "because of" discrimination include failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.[33] But the plaintiff must identify a specific reasonable accommodation or accommodations that would allow the plaintiff to perform under the

---

[30] See *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144 (2d Cir. 1998) (superseded by statute as stated in *Hilton v. Wright*, 673 F.3d 120 (2d Cir. 2012)).

[31] See, *Miller v. National Cas. Co., supra* note 27; *Trammell v. Raytheon Missile Systems*, 721 F. Supp. 2d 876 (D. Ariz. 2010); *Kolivas v. Credit Agricole*, No. 95 Civ. 5662, 1996 WL 684167 (S.D.N.Y. Nov. 26, 1996) (unpublished opinion).

[32] See *Morisky v. Broward County, supra* note 24.

[33] See 42 U.S.C. § 12112(b)(5)(A) (2006).

program at issue.[34] Moreover, courts have held that when the program provides reasonable designated channels through which participants must notify the program of the disability and the requested accommodations, then the program is not liable for a failure to accommodate unless the plaintiff utilizes those channels.[35] Only when the plaintiff has met the burden of showing a specific reasonable accommodation is the defendant obliged to rebut the plaintiff's claim by presenting evidence that the plaintiff's requested accommodation imposes an undue hardship.

Several materials presented to UNMC students clearly informed Doe that any needed accommodations were to be requested through the office of services for students with disabilities. It is undisputed that Doe did not notify the office of services for students with disabilities of his alleged disability, and he did not request any accommodations through that office. We find unavailing Doe's arguments that the denial of further postponement of exams and further leaves of absence by Hill and Moore somehow "set the tone for future accommodations,"[36] which excused his failure to properly ask for them. Doe's request for a 6-month leave of absence during his appeal of the dismissal determination was both the improper venue and improper timing. Such requests for "'second chance[s]'" are not considered reasonable accommodations.[37]

---

[34] See, *Falcone v. University of Minn., supra* note 23; *Zukle v. Regents of University of California, supra* note 20; *Terrell v. US Air*, 132 F.3d 621 (11th Cir. 1998). See, also, *US Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002).

[35] See, *Halpern v. Wake Forest University Health Sciences, supra* note 11; *Mershon v. St. Louis University, supra* note 20; *Wood v. President & Trustees of Spring Hill College*, 978 F.2d 1214 (11th Cir. 1992); *Frank v. University of Toledo*, 621 F. Supp. 2d 475 (N.D. Ohio 2007); *Abdo v. University of Vermont*, 263 F. Supp. 2d 772 (D. Vt. 2003).

[36] Brief for appellant at 40.

[37] *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 n.14 (5th Cir. 1997). See, also, *Zukle v. Regents of University of California, supra* note 20; *Wynne v. Tufts University School of Medicine*, 976 F.2d 791 (1st Cir. 1992).

We turn now to the various alleged adverse actions which make up the bulk of Doe's arguments, and which may roughly be categorized as disparate treatment claims.[38] Doe of course alleges that his dismissal from UNMC was an adverse action "because of" discrimination, but he also attacks individual actions of varying degrees of causal relationship to that dismissal. Doe asserts that his failing grade in the Ob/Gyn clerkship was the result of discrimination, and he complains that various procedural matters relating to the appeal of that grade were also discriminatory. Doe asserts that certain negative professionalism remarks in his pediatrics clerkship were the result of discrimination. Doe complains that because of discrimination, he was told he could not appeal the pediatrics shelf exam. Doe argues that the terms of the academic contract he signed were discriminatory. Doe argues that the handling of his exams and rounds at the time of his scheduled hernia surgery was the result of discrimination. Finally, Doe argues that his negative professionalism marks pertaining to his plastic surgery rotation were the result of discrimination.

[16] We begin by noting that not every slight is cognizable under the ADA and the Rehabilitation Act.[39] The element of adverse action may be something short of termination or dismissal from a program,[40] but there must be materially adverse consequences affecting the terms, conditions, or privileges under the program, such that a reasonable trier of fact could find objectively tangible harm.[41]

Doe's chief complaint concerns the terms of the academic contract he signed. We conclude that the academic contract did

---

[38] See 2 Mook, *supra* note 25, § 8.03.

[39] See *Smart v. Ball State University*, 89 F.3d 437 (7th Cir. 1996).

[40] See, *Derrick F. v. Red Lion Area School Dist.*, 586 F. Supp. 2d 282 (M.D. Pa. 2008); *O'Connor v. College of Saint Rose*, No. 3:04-CV-0318, 2005 WL 2739106 (N.D.N.Y. Oct. 24, 2005) (unpublished opinion). See, also, *Ellis v. Morehouse School of Medicine*, 925 F. Supp. 1529 (N.D. Ga. 1996).

[41] See, *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006); *Brown v. Cox*, 286 F.3d 1040 (8th Cir. 2002); *Conley v. Village of Bedford Park*, 215 F.3d 703 (7th Cir. 2000); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636 (2d Cir. 2000).

not have materially adverse consequences on Doe affecting the terms, conditions, or privileges Doe previously enjoyed under the program at UNMC. The academic contract merely clarified, for Doe, the expectations under the program applicable to all its students.

Specifically, Doe argues that the requirement that he receive a grade of pass or better in all senior electives was a material change to the SEC guidelines, because they state: "Repetition of a year will require repeating the entire course load for the repeated year and earning a grade of Pass in all repeated cores/clerkships . . . ." But the stated reasons for dismissal under the guidelines are not limited to failing repeated classes. It is self-apparent that a student may be dismissed from the medical program upon multiple failing grades. And we also note that there is evidence that other, nondisabled students asked to sign an academic contract had similar requirements.

Doe also argues that the addition of the professionalism clause to the academic contract was an adverse action. He points out that he was the only student who had such a provision added to an academic contract in the previous 5 years. The SEC guidelines clearly state, however, that documentation of repeated unprofessional behavior justifies termination of enrollment. And the junior-year professionalism statement emphasizes the importance of professionalism assessments to the program.

In the employment context, performance improvement plans presenting an employee with clear goals to achieve continued employment or stating the established consequences of certain behaviors are not considered adverse actions cognizable under the ADA or the Rehabilitation Act.[42] Likewise, here, the academic contract Doe signed merely set forth, albeit more specifically to Doe, the established academic consequences for any student who receives repeated poor professionalism marks and failing grades. The academic contract was not an adverse action for which Doe could state a claim under the ADA or the Rehabilitation Act.

---

[42] *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215 (10th Cir. 2006). See, also, *Pierre v. Napolitano*, 958 F. Supp. 2d 461 (S.D.N.Y. 2013).

We will assume for the sake of this opinion that the poor professionalism marks and comments leading up to Doe's dismissal were adverse actions cognizable under the ADA and the Rehabilitation Act, as long as they were "because of" discrimination. But the evidence, viewed in a light most favorable to Doe, fails to show that these marks were "because of" discrimination.

First, as stated, there is no evidence that the faculty making the negative evaluations of Doe in these clerkships knew he was disabled. Kinney averred that she did not perceive Doe as disabled and that Doe did not inform her that he was disabled. Doe could not contradict this statement, testifying that he did not remember what he might have told her. Smith testified that he did not know Doe had a disability and that he treated Doe as any other student. Doe did not contradict that testimony. Spann similarly stated that he had no knowledge Doe might have a disability, and Doe similarly stated nothing to the contrary. Stoolman, who made some comments about Doe's professionalism in his pediatrics clerkships, likewise averred she had no knowledge that Doe was disabled. Doe's only evidence to the contrary was that he had discussed with Stoolman that he was "dealing with depression."

[17] Second, there is abundant evidence that the negative professionalism marks were for legitimate nondiscriminatory reasons. In this regard, we clarify that adverse action may be properly based on conduct even where that conduct is related to the disability.[43] In *Newberry v. East Texas State University*,[44] the court explained that the discrimination under the ADA "is concerned not with symptoms, but with categorization." Thus, adverse action based on the conduct itself is not discriminatory as long as the "collateral assessment of disability plays

---

[43] See, *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013); *McElwee v. County of Orange*, 700 F.3d 635 (2d Cir. 2012); *Jones v. American Postal Workers Union*, 192 F.3d 417 (4th Cir. 1999); *Collings v. Longview Fibre Co.*, supra note 10; *Maddox v. University of Tennessee*, supra note 10. See, also, e.g., *Newberry v. East Texas State University*, 161 F.3d 276 (5th Cir. 1998). See, also, 2 Mook, *supra* note 25, § 8.03[1][d].

[44] *Newberry v. East Texas State University, supra* note 43, 161 F.3d at 279.

no role" in the action.[45] In *Halpern v. Wake Forest University Health Sciences*,[46] the court accordingly held that a medical student was properly discharged because of attendance problems and other unprofessional conduct, even if that conduct was a product of his disability, explaining:

> A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability.

[18-20] The defendants here made a prima facie case that the poor professionalism marks and comments pertaining to Doe were because of their academic judgment that Doe exhibited poor professionalism. As already discussed, Doe did not properly request accommodations to avoid such poor professionalism. In actions under the ADA and the Rehabilitation Act, substantial deference is generally given to academic judgments.[47] Courts are generally ill equipped, as compared with experienced educators, to determine whether a student meets a university's reasonable standards for academic and professional achievement.[48] Evaluating performance in clinical courses is no less an academic judgment than that of any other course, and is entitled to the same deference.[49]

[21] We must be wary that stated academic decisions do not disguise discrimination.[50] But Doe failed to present any

---

[45] *Id*. at 280.

[46] *Halpern v. Wake Forest University Health Sciences, supra* note 11, 669 F.3d at 465.

[47] See, e.g., *Halpern v. Wake Forest University Health Sciences, supra* note 11; *Wong v. Regents of University of California*, 192 F.3d 807 (9th Cir. 1999); *McGuinness v. University of New Mexico*, 170 F.3d 974 (10th Cir. 1998); *Zukle v. Regents of University of California, supra* note 20; *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432 (6th Cir. 1998).

[48] *Wong v. Regents of University of California, supra* note 47.

[49] See *Falcone v. University of Minn., supra* note 23.

[50] See, e.g., *Zukle v. Regents of University of California, supra* note 20.

evidence creating a material issue of fact that the reasons stated by the faculty were a pretext for discrimination. A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason.[51] Stated otherwise, the plaintiff must show circumstances raising a reasonable inference that the real reason for the adverse action was his or her perceived disability.[52] Instances of disparate treatment can support a claim of pretext, but, to do so, the plaintiff must show that he or she and the nondisabled person or persons were similarly situated in all relevant respects,[53] i.e., that they had the same supervisor, were subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances.[54] Doe presented his testimony disputing the veracity of many of the instances cited by faculty in support of his marks of poor professionalism, but nothing more. Such testimony is insufficient to overcome the defendants' prima facie case for summary judgment on these allegations.

Doe also alleges procedural inequities "because of" discrimination. He claims that evaluations leading up to his Ob/Gyn grade were created after the grading session and that some evidence was not disclosed to Doe before the hearing to the Appeal Board. He claims that O'Dell told him he could not appeal his pediatrics grade. He complains that certain documents relating to his plastic surgery evaluation may not have been presented to the SEC. He complains it was discriminatory to refuse to allow him to appeal his surgery rotation grade on the ground that he had already been dismissed. Finally, he complains that O'Dell's leaving the SEC meeting early, while giving his vote for dismissal, was evidence of discrimination.

---

[51] *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994).

[52] See *Kosmicki v. Burlington Northern & Santa Fe R. Co., supra* note 20.

[53] See, *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772 (8th Cir. 2012); *Norville v. Staten Island University Hosp.*, 196 F.3d 89 (2d Cir. 1999).

[54] *Macy v. Hopkins County Bd. of Educ.*, 429 F. Supp. 2d 888 (W.D. Ky. 2006).

[22] We find that these stated procedural acts were not materially adverse. As already noted, Doe's due process and breach of contract claims relating to these matters have failed. Doe fails to illustrate in this appeal how these procedural matters caused a tangible harm. We further note that the deference extended to academic decisions extends also to the procedural requirements surrounding those decisions.[55] Doe presented no evidence of discriminatory intent or that such alleged procedural defects did not occur with nondisabled students.

We are uncertain how precisely to categorize Doe's complaints surrounding being asked to go on rounds the day of his hernia surgery, but we find no discernible harm in these acts. Doe never received a final grade in his surgery clerkship. Also, as stated, neither Grant nor Spann, who are featured in these complaints, knew Doe was disabled. Doe indicates that Spann may have been harsher with him because of an incident where Spann missed rounds and Doe allegedly embarrassed him. Doe also asserts that various statements by Spann were "fabrications and . . . an attempt to excuse the spitefulness of his having [Doe] round prior to the shelf exam."[56] But even if that were true, it would not make a claim under the ADA and the Rehabilitation Act. As stated by another court, "[a] personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability."[57]

Having found no material issue that the poor professionalism marks were "because of" discrimination, we easily find no material issue that the discharge stemming from those marks was "because of" discrimination. Hill specifically testified that no academic action was taken against Doe because he was disabled or perceived to be disabled. And Doe did not present any evidence that UNMC's proffered legitimate reasons for his dismissal could be rebutted as pretense.

---

[55] See *Ellis v. Morehouse School of Medicine, supra* note 40. See, also, *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978).

[56] Brief for appellant at 32.

[57] *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997).

We thus find that the district court was correct in granting summary judgment on Doe's ADA/Rehabilitation Act claims.

Doe's remaining assignments of error concerning the motions to compel and the alleged failure to set a hearing date are likewise without merit. Doe's motions to compel were granted in part and denied in part. The motions pertained to Doe's request for the actual academic contracts of other UNMC students, as opposed to a summary of the terms of such contracts, although we note several academic contracts in the record with names redacted. Doe apparently believes the court erred insofar as it denied the motions to compel and erred by failing to schedule a separate hearing at the expiration of the period in which compelled documents were to be delivered. We have already held that asking Doe to sign the academic contract was not an adverse action, and thus there could be no prima facie case of discrimination based on that event. No amount of discovery pertaining to the terms of other students' academic contracts could create a material issue of fact preventing summary judgment as to this alleged discriminatory act. For that reason, if no other, we find no merit to the errors assigned on the motions to compel.

## VI. CONCLUSION

The district court was correct to dismiss the individual defendants in their individual capacities. The remaining defendants made a prima facie case that they were entitled to summary judgment. Doe failed to produce evidence in response that would create a material issue of fact preventing judgment as a matter of law. Doe's assignments of error pertaining to discovery are without merit. We therefore affirm the district court's order.

AFFIRMED.

WRIGHT and STEPHAN, JJ., not participating.